STATE OF NORTH CAROLINA v. LINWOOD EARL FORTE

No. 20A04

(Filed 5 May 2006)

**1. Constitutional Law; Evidence— right of confrontation— S.B.I. reports—preparer unavailable for cross-examination—business records—no *Crawford* violation**

Defendant's right of confrontation under *Crawford v. Washington,* 541 U.S. 36 (2004), was not violated by the admission of S.B.I. reports, containing both analysis results and chain of custody information, prepared by an S.B.I. agent who did not testify at trial and was unavailable for cross-examination by defendant because the reports are not testimonial statements that are inadmissible under *Crawford* but are purely ministerial observations that do not offend the public records exception of N.C.G.S. § 8C-1, Rule 803(8) and were properly admitted under

the business records exception to the hearsay rule set forth in N.C.G.S. § 8C-1, Rule 803(6).

**2. Confessions and Incriminating Statements— custodial interrogation—no unequivocal invocation of right to silence**

Defendant did not unequivocally invoke his right to silence during custodial interrogation, and his written statement was properly admitted in his capital trial, where defendant unexpectedly answered "no" when asked if he wanted to answer any more questions at that time, an officer asked defendant what he meant, defendant responded that he was tired and would answer more questions after he had a chance to sleep, and after sleeping for several hours, defendant affirmed his willingness to continue and reviewed and signed the written statement. Under these circumstances, defendant's "no" was ambiguous and the officer did not violate defendant's constitutional rights by asking for amplification.

**3. Sentencing— capital—mitigating circumstances—lack of significant prior history of criminal activity—subsequent behavior—harmless error**

Although the trial court erred in a capital sentencing proceeding by considering defendant's criminal behavior subsequent to the murders in its determination not to submit the N.C.G.S. § 15A-2000(f)(1) mitigating circumstance of defendant's lack of significant prior history of criminal activity, this error was harmless because the events and behavior cited by the court that occurred before the murders by themselves adequately support its decision not to submit the circumstance.

**4. Sentencing— capital—mitigating circumstances—mental or emotional disturbance—impaired capacity—peremptory instructions not required**

The trial court did not err in a capital sentencing proceeding by refusing to give the requested peremptory instructions on the statutory mitigating circumstances under N.C.G.S. § 15A-2000(f)(2) that the murders were committed while defendant was under the influence of a mental or emotional disturbance and under N.C.G.S. § 15A-2000(f)(6) that the capacity of defendant to conform his conduct to the requirements of the law was impaired, because: (1) although defendant relied on the testimony of a psychologist and two psychiatrists as evidence supporting these two statutory mitigating circumstances, the tes-

IN THE SUPREME COURT 429

timony of an expert witness who has prepared an analysis of a defendant in preparation for trial lacks the indicia of reliability based on the self-interest inherent in obtaining appropriate medical treatment and, since it is not manifestly credible, does not support a peremptory instruction; and (2) the evidence supporting the submission of the (f)(2) and (f)(6) mitigating circumstances was not uncontroverted.

5. **Criminal Law; Evidence— cross-examination—prosecutor's argument—amenities of prison life—no gross impropriety**

The trial court did not commit plain error in a capital sentencing proceeding by allowing one of defendant's witnesses to be cross-examined about the amenities of prison life or by not intervening *ex mero motu* when the State argued that these amenities made life without parole an inappropriate sentence.

6. **Sentencing— capital—aggravating factors—failure to submit to jury—*Blakely* error**

The trial court erred by increasing defendant's sentence for noncapital offenses beyond the presumptive range by finding the aggravating factor that the victim was physically infirm without submitting this aggravating factor to the jury for proof beyond a reasonable doubt.

7. **Sentencing— death penalty—proportionate**

The trial court did not err in a triple first-degree murder case by sentencing defendant to death, because: (1) there were multiple murder victims and multiple aggravating circumstances; (2) defendant killed elderly and defenseless victims in their own homes; (3) this Court has found that each of the N.C.G.S. § 15A-2000(e)(5), (e)(9), and (e)(11) aggravating circumstances is, standing alone, sufficient to justify the imposition of the death penalty.

Justice MARTIN concurring in a separate opinion.

Justice NEWBY joining in the concurring opinion.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing consecutive death sentences entered by Judge Thomas D. Haigwood on 8 October 2003 in Superior Court, Wayne County, upon jury verdicts finding defendant guilty of three counts of first-degree murder. On 21 December 2004, the Supreme Court

allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 14 November 2005.

*Roy Cooper, Attorney General, by William B. Crumpler and Amy C. Kunstling, Assistant Attorneys General, for the State.*

*Thomas K. Maher for defendant-appellant.*

EDMUNDS, Justice.

Defendant Linwood Earl Forte was indicted for three counts of first-degree murder, three counts of first-degree rape, three counts of first-degree burglary, attempted first-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, first-degree arson, and burning of personal property. The charges were consolidated for trial, which began on 8 September 2003. At the close of the evidence, the charges of attempted first-degree murder and burning of personal property were dismissed.

On 30 September 2003, defendant was convicted of three counts of first-degree murder. The jury recommended a sentence of death for each conviction and the trial court entered judgment accordingly. The jury also found defendant guilty of three counts of first-degree burglary and three counts of first-degree rape. The court arrested judgment on two of the first-degree burglary counts and sentenced defendant to four consecutive life sentences for the remaining burglary and rape convictions. Finally, the jury found defendant guilty of assault with a deadly weapon with intent to kill inflicting serious injury, for which he received a twenty-year consecutive sentence, and first-degree arson, on which the court arrested judgment.

Defendant appealed his capital convictions to this Court and we allowed his motion to bypass the Court of Appeals as to his other convictions. We conclude that defendant's trial and capital sentencing proceeding were free from prejudicial error and that defendant's sentences of death were not disproportionate. However, we vacate the trial court's sentencing on the non-capital charges and remand for a new sentencing hearing.

The State's evidence showed that defendant committed three sets of offenses in Goldsboro. As to the first, in the early morning of 26 May 1990, seventy-year-old Eliza Jones was found in her bed, bruised, scratched, and struggling to breathe. She was suffering from oxygen deprivation as a result of strangulation and later recalled being

choked and fondled by a man who had awakened her. Trauma to both her vagina and rectum indicated that she had been sexually assaulted after losing consciousness during the attack. Sperm was detected in vaginal and rectal smears and on the fitted sheet on Ms. Jones' bed. No perpetrator was identified at the time, so the evidence containing the sperm was placed in frozen storage at the State Bureau of Investigation (SBI) for possible future use.

As to the second offense, on the morning of 14 July 1990, police found the body of seventy-nine-year-old Hattie Bonner in her bed. She had died as a result of being both manually strangled and suffocated with a pillow. Vaginal swabs revealed the presence of sperm, and hairs and fibers were collected from the body. As in the Jones case, the evidence was retained by the SBI because investigators did not have a suspect.

Finally, on 6 October 1990, the Goldsboro Fire Department · responded to the home of seventy-eight-year-old Alvin Bowen and seventy-five-year-old Thelma Bowen. The house and an automobile in an adjoining carport were burning. Firefighters discovered Mr. Bowen's body on a bed and Mrs. Bowen's naked body lying face down on the floor nearby. Although both bodies were burned, an autopsy indicated that each had been killed before the fire started. Mr. Bowen died from stab wounds to his neck and chest, while Mrs. Bowen died from strangulation. Evidence suggested that Mrs. Bowen had been raped, and sperm was present in a vaginal smear. Firefighters discovered a trail of accelerant leading from the Bowens' bedroom through the house and out to the burning vehicle, where a gasoline can was found on the front seat. Again, the evidence was preserved in the absence of a suspect.

Analysis of the DNA samples obtained in each of these incidents indicated that one person was responsible for all three attacks. During the 1990s, defendant was incarcerated on other unrelated charges and his DNA was recorded in the SBI database. In 2001, after defendant had been released, his DNA was matched with the DNA recovered from the unsolved cases.

On 30 April 2001, defendant was working at a poultry processing plant. Several SBI agents and Goldsboro police officers approached defendant at work and asked if he would accompany them to the police station for an interview. Defendant was told that he was not under arrest and could return to work after the interview was completed. When defendant agreed, the officers

gave him a ride to the police department. Defendant was not advised of his *Miranda* rights.

Once at the police station, the officers informed defendant that his DNA had been matched to the evidence in some unsolved cases and asked him to explain his involvement in the crimes. Defendant told police that during the late 1980s through 1990 he used crack cocaine heavily. He recalled going to a house he thought was his own, kicking in the door, and having "sex with the woman inside." Defendant also stated that one night in 1990, he went into a residence near a school in Goldsboro where he drank beer and smoked cigarettes. He said he did not recall having sexual intercourse with anyone or any confrontation inside the house, but he could not remember what happened because he was high on crack and had blacked out while inside the house. He added that he may have dropped a lit match on his way out, and he remembered noticing the following day that the house had burned.

Defendant then agreed to ride with several of the investigators and point out the locations he had just discussed. Defendant first directed them to Eliza Jones' former address. Once there, defendant said that this was the place where "the woman was not killed." He next took them to a vacant lot where the Bowens' home had stood before it burned and told the officers that this was where he drank beer and smoked cigarettes in the house. Finally, defendant led the officers to another vacant lot where Hattie Bonner's home had been. He explained that at this location, he entered the residence, had sexual intercourse with the lady inside, and choked her until she became unconscious. He recalled seeing yellow crime scene tape at the residence the next day.

The police returned with defendant to the police station, where defendant agreed to provide blood and hair samples. For the first time, defendant was advised of his *Miranda* rights. One of the officers who was giving the *Miranda* warnings asked defendant if he wanted to answer any more questions at that time. When defendant answered "no," the officer asked defendant what he meant. Defendant responded that he was tired and would answer more questions after he had a chance to sleep.

While defendant slept for several hours at the police station, one of the officers typed a statement based on the information defendant had already provided. When defendant awoke, he said he "felt like talking some more." The investigators re-advised defendant of his

rights, and defendant affirmed his willingness to continue. He reviewed the typed statement and signed it. Defendant then answered several additional questions asked by the officers, indicating that he knew right from wrong and that he had not been under duress at the time of the crimes, although he added that he had not been in "the right frame of mind" and "was under the influence of drugs." The blood drawn from defendant on 30 April 2001 was analyzed by the SBI laboratory and found to match the DNA from the three 1990 crime scenes.

Additional evidence will be discussed below as necessary to address specific issues.

## GUILT-INNOCENCE PHASE

[1] Defendant first contends that the trial court erred in allowing the State to introduce certain SBI reports as substantive evidence because the law enforcement investigator who prepared the reports did not testify. The investigator in question, SBI Special Agent D.J. Spittle, did not participate in the investigation of the assault on victim Eliza Jones. However, as to victim Hattie Bonner, the evidence showed that Deborah Radisch, M.D. conducted an autopsy on 15 July 1990. Dr. Radisch provided vaginal swabs and smears to Officer Karen Laboard, who submitted the evidence to the SBI laboratory. As a serologist at the SBI laboratory in 1990, Agent Spittle would receive samples of blood and bodily fluids sent to the laboratory for analysis, examine the samples and identify the fluids, and then refer the material to other investigators in the laboratory for further analysis. His records reflected both the results of his investigation and his disposition of the evidence. After receiving and analyzing the serological evidence in the Bonner case, Agent Spittle on 27 November 1990 passed along to SBI Special Agent Michael Budzynski the evidence relating to sperm from the vaginal swabs and smears. Agent Budzynski determined that the DNA in the samples matched the DNA recovered in the Jones case, then preserved the evidence.

As to victim Thelma Bowen, an autopsy was conducted on 6 October 1990 by Frances Owl-Smith, M.D., who collected rectal and vaginal swabs that she provided to the police. The police submitted these samples to the SBI laboratory. Agent Spittle received and examined this evidence, then turned it over to Agent Budzynski on 27 November 1990. Agent Budzynski tested this material for DNA, noted that it matched the DNA in the samples recovered in the Jones and Bonner investigations, then preserved the evidence. In 2000, Agent

Budzynski conducted a new DNA analysis of the evidence in all three cases and entered the updated results in the SBI computer.

On 30 April 2001, the blood sample obtained from defendant by the Goldsboro police investigators was delivered to Agent Budzynski by SBI Agent Mark Nelson, who had been present when the sample was taken. Agent Budzynski determined that the DNA in defendant's blood matched to near certainty the DNA recovered from the Jones, Bonner, and Bowen crime scenes.

Agent Spittle left his employment with the SBI in 2001 and did not testify at defendant's trial. His reports were introduced into evidence through Agent Nelson, who had been Agent Spittle's supervisor in the 1990s. The court admitted the reports into evidence under the business records exception to the hearsay rule, N.C.G.S. § 8C-1, Rule 803(6). Defendant argues that the introduction of the reports, containing both analysis results and chain of custody information, violated his constitutional right of confrontation.

At trial, defendant argued only that the evidence was inadmissible under the rules relating to hearsay. After defendant's trial, the United States Supreme Court held in *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177 (2004), that admission at trial of testimonial evidence made by a non-testifying person violated the defendant's confrontation rights unless the declarant was currently unavailable to testify and the defendant previously had the opportunity to cross-examine the declarant. *Id.* at 53-54, 59, 158 L. Ed. 2d at 194, 197. Here, defendant was unable to cross-examine Agent Spittle. Therefore, we must determine whether his reports are testimonial statements that are inadmissible under *Crawford*.

Although the Supreme Court in *Crawford* declined to provide an overarching definition of "testimonial" evidence, it did give general guidance, along with some specific instances of evidence that is testimonial. "Whatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68, 158 L. Ed. 2d at 203. In enunciating its holding, the Supreme Court pointed out that an evil it was seeking to suppress was the danger inherent in having damning evidence admitted without being tested through cross-examination. "Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse—a fact borne out time and again throughout a history with which the Framers were keenly familiar."

*Id.* at 56 n.7, 158 L. Ed. 2d at 196 n.7. The types of evidence that the Supreme Court listed as definitely being testimonial "are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Id.* at 68, 158 L. Ed. 2d at 203.

Under the Supreme Court's analysis, the reports at issue here are not testimonial. They do not fall into any of the categories that the Supreme Court defined as unquestionably testimonial. These unsworn reports, containing the results of Agent Spittle's objective analysis of the evidence, along with routine chain of custody information, do not bear witness against defendant. *See* *id.* at 50-52, 158 L. Ed. 2d at 192-93. Instead, they are neutral, having the power to exonerate as well as convict. Although we acknowledge that the reports were prepared with the understanding that eventual use in court was possible or even probable, they were not prepared exclusively for trial and Agent Spittle had no interest in the outcome of any trial in which the records might be used. *See id.* at 56 n.7, 158 L. Ed. 2d at 196 n.7.

Consistent with this interpretation, the Supreme Court in *Crawford* indicated in dicta that business records are not testimonial. *Id.* at 56, 158 L. Ed. 2d at 195-96 ("Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy."). The distinction between business records and testimonial evidence is readily seen. Among other attributes, business records are neutral, are created to serve a number of purposes important to the creating organization, and are not inherently subject to manipulation or abuse.

Business records are defined under Rule 803(6), which provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .

(6) Records of Regularly Conducted Activity.—A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the

method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

N.C.G.S. § 8C-1, Rule 803(6) (2005). Agent Nelson was Agent Spittle's supervisor and was responsible for creating and implementing laboratory polices regarding record-keeping. Agent Nelson testified that Agent Spittle created the reports contemporaneously with his work as part of the regular practice of the agency and within the ordinary course of agency business. Accordingly, we agree with the trial court that the reports are business records under Rule 803(6).

However, our determination that the reports in question can be considered business records does not end our inquiry. Under Rule 803(8),

[t]he following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .

(8) Public Records and Reports.—Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law-enforcement personnel, or (C) in civil actions and proceedings and against the State in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

*Id.* § 8C-1, Rule 803(8) (2005). The SBI reports in question also fall under the definition of public records set out in this rule, and "[p]ublic records and reports that are not admissible under Exception (8) are not admissible as business records under Exception (6)." *Id.* § 8C-1, Rule 803(8) Cmt.[1] As a result, we must determine whether these reports are admissible under Rule 803(8) before we can decide whether they are admissible as business records.

1. We assume without deciding that this Comment reflects the intent of the General Assembly. 1983 N.C. Sess. Laws ch. 701, § 2; *State v. Hosey*, 318 N.C. 330, 337 n.2, 348 S.E.2d 805, 810 n.2 (1986).

STATE v. FORTE

[360 N.C. 427 (2006)]

Defendant contends that the provision in Rule 803(8)(C) that findings from an investigation made under authority of law are admissible "against the State" means that these laboratory reports are inadmissible when offered by the State against defendant. However, in interpreting the public records exception to the hearsay rule, the Oregon Court of Appeals held that

> in adopting FRE 803(8)(B), Congress did not intend to change the common law rule allowing admission of public records of purely "ministerial observations." Rather, Congress intended to prevent prosecutors from attempting to prove their cases through police officers' reports of their observations during the investigation of crime. *United States v. Grady*, 544 F.2d 598, 604 (2d Cir. 1976). We infer that the state legislature adopted [Oregon Evidence Code Section] 803(8)(b) with the same intent.

*State v. Smith*, 66 Ore. App. 703, 706, 675 P.2d 510, 512 (1984). We cited this language with approval in reaching a similar result as to business records in a case dealing with reports of breathalyzer testing. *State v. Smith*, 312 N.C. 361, 381, 323 S.E.2d 316, 327-28 (1984); *see also Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . ."). Accordingly, if Agent Spittle's reports fall under this exception for "purely 'ministerial observations,' " they are not inadmissible under either Rule 803(6) or 803(8).

Here, the reports concern routine, nonadversarial matters. Although the record is silent, common experience tells us that such reports are prepared for a number of purposes, including statistical analysis and construction of databases. *See e.g.*, http://www.ncsbi.gov/crimestatistics. Thus, potential use in court was only one purpose among several served by the creation and compilation of Agent Spittle's reports. Agent Spittle's analysis of the evidence on hand also facilitated further examination of the evidence within the SBI laboratory. Therefore, these reports are records of purely ministerial observations that do not offend the public records exception and were properly admitted as business records.

[2] Defendant next argues that the trial court erred in admitting statements he made after he asserted his Fifth Amendment right to silence. The trial court denied defendant's motion to suppress his signed written statement to police. However, the motion to suppress and the supporting arguments were based on the contention

that the officers should have read defendant his *Miranda* rights earlier in the process, before they elicited any statement from him. Only on appeal does defendant refer to the issue of defendant's purported invocation of his right to silence. "This Court will not consider arguments based upon matters not presented to or adjudicated by the trial court." *State v. Haselden*, 357 N.C. 1, 10, 577 S.E.2d 594, 600, *cert. denied*, 540 U.S. 988, 157 L. Ed. 2d 382 (2003); *see also* N.C. R. App. P. 10(b)(1). Because the trial court did not have the opportunity to rule on this issue and defendant did not argue plain error in his brief, this issue is not properly before the Court. *See State v. Frye*, 341 N.C. 470, 496, 461 S.E.2d 664, 677 (1995) ("Defendant objected to the evidence on only one ground; thus, he failed to preserve the additional grounds presented on appeal. He also waived appellate review of those arguments by failing specifically and distinctly to argue plain error. N.C. R. App. P. 10(c)(4)."), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996).

Even if the issue had been properly preserved, we discern no error. Although custodial interrogation must cease when a suspect unequivocally invokes his right to silence, an ambiguous invocation does not require police to cease interrogation immediately. *State v. Golphin*, 352 N.C. 364, 450-52, 533 S:E.2d 168, 224-25 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). Here, defendant had been cooperative from the beginning of his encounter with the police and had been forthcoming in his answers to the investigators' questions. When defendant unexpectedly answered "no" upon being asked if he wished to answer any more questions, the officer did no more than ask him what he meant. In responding, defendant explained that he was tired and would answer more questions after he slept. Under these circumstances, defendant's "no" was ambiguous, and the officer did not violate defendant's constitutional rights by asking for amplification. This assignment of error is overruled.

## SENTENCING PROCEEDING ISSUES

[3] Defendant argues that the trial court erred in relying on his criminal conduct that occurred after the murders when it determined not to submit as a mitigating circumstance defendant's lack of significant prior history of criminal activity, pursuant to N.C.G.S. § 15A-2000(f)(1). Defendant also makes the related argument that the court erred in not submitting this mitigating circumstance to the jury. We agree that the trial court erred in considering defendant's criminal behavior subsequent to the murders in determining not to

submit the (f)(1) circumstance. *See State v. Coffey*, 336 N.C. 412, 418, 444 S.E.2d 431, 434 (1994) (explaining that the (f)(1) circumstance "pertains only to that criminal activity committed before the murder"). However, we find that this error was harmless in light of the other competent evidence relating to this circumstance presented to the court.

"The test governing the decision to submit the (f)(1) mitigator is 'whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity.'" *State v. Walker*, 343 N.C. 216, 223, 469 S.E.2d 919, 922 (quoting *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988)), *cert. denied*, 519 U.S. 901, 136 L. Ed. 2d 180 (1996). In making this determination, the trial court considers the number, nature, and age of the prior criminal activities. *State v. Sexton*, 336 N.C. 321, 375, 444 S.E.2d 879, 910, *cert. denied*, 513 U.S. 1006, 130 L. Ed. 2d 429 (1994). The evidence here showed that prior to the murders, defendant's criminal convictions included: felonious larceny and possession of stolen property in 1982, driving while impaired in 1984, resisting and assaulting a police officer during a fight in a club in 1988, and driving while license revoked in 1989.[2] Defendant had been incarcerated for the assault. In addition, testimony was presented regarding defendant's alcohol dependence and continual illegal drug use, his probation and parole violations, and his "extensive history of aggressive behavior."

We review a trial court's decision whether to submit the (f)(1) mitigating circumstance on the basis of the whole record. *State v. Hurst*, 360 N.C. 181, 197, 624 S.E.2d 309, 322 (2006). The court took into account all the evidence of defendant's criminal activity that occurred before the murders. In addition, the court noted that defendant specifically did not request the (f)(1) instruction. It then concluded that no reasonable juror could find the (f)(1) mitigating circumstance. Although the trial court erroneously included defendant's post-murder behavior in its recitation of defendant's history of criminal activity, the events and behavior cited by the court that occurred before the murders by themselves adequately support its decision not to submit the circumstance. *See id.* at 196-99, 624 S.E.2d at 321-23. Accordingly, the trial court did not commit prejudicial error as to this issue.

[4] Defendant next argues that the trial court erred in refusing to give requested peremptory instructions on the statutory mitigating

---

2. We cannot determine from the record the date of defendant's conviction for horse wrestling. Consequently, we do not consider that conviction in our analysis.

circumstances that the murders were committed while defendant was under the influence of a mental or emotional disturbance, pursuant to N.C.G.S. § 15A-2000(f)(2), and that the capacity of defendant to conform his conduct to the requirements of the law was impaired, pursuant to N.C.G.S. § 15A-2000(f)(6). "If requested, a trial court should give a peremptory instruction for any statutory or nonstatutory mitigating circumstance that is supported by uncontroverted and manifestly credible evidence." *State v. Bishop*, 343 N.C. 518, 557, 472 S.E.2d 842, 863 (1996), *cert. denied*, 519 U.S. 1097, 136 L. Ed. 2d 723 (1997). Here, the trial court gave non-peremptory instructions as to these issues and the jury did not find either circumstance as to any of the murders.

Defendant relied on the testimony of a psychologist and two psychiatrists as evidence supporting these two statutory mitigating circumstances. These witnesses, who were all hired by the defense, had no contact with defendant until after his arrest for these murders. We have held that "the testimony of an expert witness who has prepared an analysis of a defendant in preparation for trial 'lacks the indicia of reliability based on the self-interest inherent in obtaining appropriate medical treatment' and, because not 'manifestly credible,' does not support a peremptory instruction." *State v. Barden*, 356 N.C. 316, 377, 572 S.E.2d 108, 146 (2002) (quoting *Bishop*, 343 N.C. at 557-58, 472 S.E.2d at 863-64), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003).

In addition, the evidence supporting the submission of the (f)(2) and (f)(6) mitigating circumstances was not uncontroverted. The substance abuse counselor who saw defendant in 1990 testified that defendant seemed mentally well-oriented and did not display or report any psychotic symptoms. Several of defendant's friends and family testified that they never saw any signs that defendant had a mental or emotional disturbance. Therefore, because the evidence in support of the (f)(2) and (f)(6) mitigating circumstances was neither manifestly credible nor uncontroverted, the trial court did not err in denying the request for peremptory instructions.

These assignments of error are overruled.

[5] Defendant next contends that the trial court erred both in allowing one of his witnesses to be cross-examined about the amenities of prison life and in not intervening *ex mero motu* when the State argued that these amenities made life without parole an inappropriate sentence. Defendant argues to this Court that the State's

**STATE v. FORTE**

[360 N.C. 427 (2006)]

cross-examination and closing argument implicated his rights under the Eighth Amendment. However, because defendant failed to make this constitutional argument at trial, we will not consider it on appeal. *State v. Lloyd*, 354 N.C. 76, 86-87, 552 S.E.2d 596, 607 (2001) ("Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal.").

Moreover, defendant did not object at trial to the cross-examination in question, nor did he object to the State's closing argument. Therefore, we review the pertinent portion of the cross-examination only for plain error and the challenged portion of the closing argument to determine if it was grossly improper. *See State v. Locklear*, 349 N.C. 118, 156, 505 S.E.2d 277, 299 (1998) (applying the plain error rule to questions asked on cross-examination that were not objected to at trial), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999); *see also State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) ("The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*.").

We begin with the cross-examination of James Aiken. "Before an error by the trial court amounts to 'plain error,' we must be convinced that absent the error the jury probably would have reached a different verdict." *State v. Waddell*, 351 N.C. 413, 419, 527 S.E.2d 644, 648 (2000). The substance of witness Aiken's testimony was that the North Carolina prison system could securely house defendant.

During the State's cross-examination of Aiken, the prosecutor elicited the following testimony:

Q. Can you tell the jury what kind of exercise people get to do when they are in maximum security like playing basketball or other activities?

A. They get to play basketball. They get to have noncontact sports but understanding is [sic] that you are playing with other dangerous people.

Q. Other than basketball, what other type of exercise activities can prisoners do?

A. Well, most of the weightlifting equipment have [sic] been moved out of the prison system but inmates can be involved with basketball as well as handball and sometimes volleyball.

Q. And there's the issue of entertainment. I guess the prison tries to keep prisoners entertained or distracted to some degree. Will Mr. Forte get some of that?

A. It's all in relationship to his behavior. Also what is allowed. The type of so-called recreation/entertainment is in direct relationship to his custody and supervision, which will always be in a maximum security environment.

Q. Which would include what?

A. Which would include being able to go to religious programs, that is, people coming in; singing groups, as an example.

Q. Go ahead, give us more examples. You have a lot of experience in this area.

A. It's fairly limited in a maximum security environment because you don't let everybody come in and go out.

You do have some people that come in to provide lectures in relationship to how to improve your behavior, some people that have made mistakes in the past and was [sic] able to come back and share with people. Examples of that being Chuck Colson and his religious crusade coming in and providing religious worship for the inmate population.

You will find that mostly in a maximum security environment that "entertainment" is focused more on volunteers and people from the religious environment.

Q. Television?

A. Some have television, yes.

Q. Radio?

A. Radios, yes. Of course, those are very closely supervised. And one additional thing is canteen. They can buy certain things off the canteen. That's considered as a privilege also. Visitation.

Q. So they can go to their canteen store and get them a candy treat, things like that?

A. And that can be easily taken away in relationship to behavior.

The scope of cross-examination lies within the discretion of the trial judge, and the questions must be asked in good faith. *State v.*

*Williams*, 279 N.C. 663, 675, 185 S.E.2d 174, 181 (1971). Here, defense counsel questioned Aiken as to the structure of the prison unit to show that defendant could be securely housed there without incident. The State responded by cross-examining Aiken about the particular conditions of that housing. The State's line of questioning was not outside the bounds of permissible cross-examination, nor was there any indication that the questions were not asked in good faith. There was no error, let alone plain error, in allowing this cross-examination to take place. This assignment of error is overruled.

We now turn to the State's closing argument regarding the prison amenities. During closing arguments the prosecutor told the jury:

> But we do know from Mr. Aiken what the defendant will have in prison. He'll have what he's constitutionally entitled to. He'll have his space, he'll have his nourishment, he'll have his recreation, whether it be basketball or handball; he'll have his television and radio.
>
> . . . .
>
> Apparently the prospects of prison don't sadden this defendant. I mean, it is a place he has spent a good portion of his adult life in. He's made choices to go back again and again and again. Ask yourself is life in prison punishment that fits these crimes?

We have held that it is not improper for the State to argue that "the defendant deserved the penalty of death rather than a comfortable life in prison." *State v. Alston*, 341 N.C. 198, 252, 461 S.E.2d 687, 717 (1995), *cert. denied*, 516 U.S. 1148, 134 L. Ed. 2d 100 (1996); *accord State v. May*, 354 N.C. 172, 179, 552 S.E.2d 151, 156 (2001), *cert. denied*, 535 U.S. 1060, 152 L. Ed. 2d 830 (2002). The prosecutor's remarks are consistent with these prior holdings. This assignment of error is overruled.

Defendant further argues that the trial court erred in not acting to prevent the State from making other improper closing arguments during the sentencing proceeding. Specifically, defendant claims that it was improper for the State to argue that Mrs. Bowen's awareness of her husband's murder before her own death made her murder especially heinous, atrocious, or cruel. Defendant also contends that a portion of the State's argument was intended to make the jurors feel personally responsible for any injury defendant might cause if he were sentenced to life in prison instead of death. Defendant did not object to these arguments at trial.

We begin by addressing the State's comments about Mrs. Bowen. The trial court submitted to the jury various aggravating circumstances for each of the three murders at issue. In the case of Mrs. Bowen, one of the aggravating circumstances was that the murder was especially heinous, atrocious, or cruel. In support of that circumstance, the State argued that the jury should:

> [t]hink about the evidence you saw at that scene. Think about where you saw Thelma Bowen on the floor. Think about the fact that Alvin Bowen had been murdered in the bed, the way he was. He never had a chance. He was struck and struck and struck with that knife in the bed, barely able to get his hands up to defend himself. Where did this blind lady go? She didn't go right out the door, her bed right there at the door, right next to the door. She went after Linwood Forte to try to save her husband, to try to save him from the knife plunging into his body. She was blind, elderly. She's aware of what is going on to her husband. She might not know every detail but she knows he's being attacked. She can hear muffled screams with the pillow put over his face. She knows something horrible is going on. She's fully aware of impending doom that was going to be suffered by her husband and she's got to be aware of what is coming for her.

Because defendant did not object to this portion of the closing argument, we review for gross impropriety. *Jones,* 355 N.C. at 133, 558 S.E.2d at 107.

During closing arguments, "[a]n attorney may, . . . on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue." N.C.G.S. § 15A-1230(a) (2005). "[C]ounsel are given wide latitude in arguments to the jury and are permitted to argue the evidence that has been presented and all reasonable inferences that can be drawn from that evidence." *State v. Richardson,* 342 N.C. 772, 792-93, 467 S.E.2d 685, 697, *cert. denied,* 519 U.S. 890, 136 L. Ed. 2d 160 (1996). "Prosecutors may, in closing arguments, create a scenario of the crime committed as long as the record contains sufficient evidence from which the scenario is reasonably inferable." *Frye,* 341 N.C. at 498, 461 S.E.2d at 678.

Here, the State drew reasonable inferences from the evidence and presented to the jury a plausible scenario supported by that evidence. The fact that Mr. Bowen was killed in his bed suggests that he was attacked first. Apparent defensive wounds to his hands indicated that he struggled with his assailant. Mrs. Bowen's body was found on

the bedroom floor. This evidence reasonably implies that, although she was blind, Mrs. Bowen heard the attack on her husband and left her bed in a doomed attempt to help him. Consequently, the argument was not improper. This assignment of error is overruled.

We now turn to the final challenged portion of the State's closing argument. The prosecutor told the jury:

> Your responsibility is a solemn one. Your decision will take strength. You know what your duties are. Some time down the road, some time in the future, you may pick up a newspaper and may see on TV or hear some radio broadcast that today Linwood Forte, the triple murderer, serial murderer from Goldsboro, North Carolina, that killed three elderly victims in 1990 was executed in the prison system of the state of North Carolina. When you hear it, you're going to have to deal with it. You have to live with it.

> Let me tell you something else. By the same token, you may hear on TV or may read in the newspaper, hear it on the radio that today Linwood Forte, triple murderer, serial killer from Goldsboro, North Carolina, killed a correctional officer in the Department of Correction, killed a doctor, killed a nurse, killed a secretary, murdered an administrator. And if you hear that, you're going to have to live with that, too.

As before, defendant did not object to this argument, and we review it now only to determine if the argument was so grossly improper that the trial court erred by not intervening *ex mero motu*. Read in context, we find nothing improper about the State's argument. The prosecutor stressed to the jurors that there would be consequences no matter what they decided in this case and that they had a duty to reflect on their decision and take their responsibilities seriously. This argument did not violate the limitations of N.C.G.S. § 15A-1230(a) and did not necessitate the trial court's intervention. This assignment of error is overruled.

[6] Finally, defendant argues that, in sentencing him on the non-capital offenses, the trial court erred in considering a factor in aggravation that was not found by the jury. Specifically, defendant was convicted of burglary and assault with a deadly weapon with intent to kill inflicting serious injury in the Eliza Jones case. Sentence was imposed under the Fair Sentencing Act, which applied because the offenses were committed in 1990. The trial court found two aggravat-

ing factors, that defendant had prior convictions punishable by more than sixty days confinement and that the victim was physically infirm. The only mitigating factor found by the court was that, prior to arrest, defendant voluntarily acknowledged wrongdoing in connection with the offense to a law enforcement officer. The court found that the aggravating factors outweighed the mitigating factors and imposed aggravated sentences for each crime.

Although the trial court properly could consider defendant's prior criminal history, we conclude that it erred by increasing defendant's sentence beyond the presumptive range by finding that the victim was physically infirm. *See Blakely v. Washington*, 542 U.S. 296, 301, 159 L. Ed. 2d 403, 412 (2004) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed maximum must be submitted to the jury and proved beyond a reasonable doubt." (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L. Ed. 2d 435 (2000))). A *Blakely* error is a structural error requiring a new sentencing hearing. *State v. Allen*, 359 N.C. 425, 449, 615 S.E.2d 256, 272 (2005). Accordingly, we remand for a new sentencing hearing on the non-capital convictions of burglary and assault with a deadly weapon with intent to kill inflicting serious injury.

## PRESERVATION ISSUES

Defendant raises three issues that he concedes have been previously decided by this Court contrary to his position. First, he contends that the death penalty statute is unconstitutional. We have rejected this argument. *See, e.g., State v. Williams*, 350 N.C. 1, 35-36, 510 S.E.2d 626, 648, *cert. denied*, 528 U.S. 880, 145 L. Ed. 2d 162 (1999). Next, he contends that the trial court erred in not dismissing the first-degree murder indictments for failure to allege all of the required elements. We have previously upheld the use of short form indictments. *See, e.g., State v. Wallace*, 351 N.C. 481, 504-05, 528 S.E.2d 326, 341, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000). Finally, defendant argues that the trial court erred in overruling defendant's objection to the use of the "especially heinous, atrocious, or cruel" aggravating circumstance set forth in N.C.G.S. § 15A-2000(e)(9), asserting that it is unconstitutionally vague and fails to narrow the class of persons who are eligible for the imposition of the death penalty. We have held that this aggravating circumstance is constitutional. *State v. Syriani*, 333 N.C. 350, 391-92, 428 S.E.2d 118, 141, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993).

Defendant raises these issues for the purposes of urging this Court to reconsider its prior decisions and preserving his right to argue these issues on federal review. We have considered his arguments on these additional issues and find no compelling reason to depart from our previous holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

Finally, we must now determine whether the record supports the aggravating circumstances found by the jury, whether "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor," and whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (2005).

The jury found the same two aggravating circumstances as to each of the three murders: (1) the murder was committed while defendant was engaged in the commission of a burglary, pursuant to N.C.G.S. § 15A-2000(e)(5), and (2) the murder was part of a course of conduct in which defendant engaged and that course of conduct included the commission by defendant of other crimes of violence against another person or persons, pursuant to N.C.G.S. § 15A-2000(e)(11). In addition, as to the Bowens' murders, the jury found the murders were committed while defendant was engaged in the commission of arson, pursuant to N.C.G.S. § 15A-2000(e)(5), and that the murder of Thelma Bowen was especially heinous, atrocious, or cruel, pursuant to N.C.G.S. § 15A-2000(e)(9). After a careful review of the trial transcript, record on appeal, briefs, and oral arguments in this case, we conclude that the record supports all of the aggravating circumstances found by the jury for each of the murders. Moreover, there is no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

[7] We now turn to the issue of proportionality. We conduct a proportionality review in order to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 203-04, 344 S.E.2d 775, 782 (1986). In determining whether defendant's sentence of death is excessive or dispro-

portionate, we compare this case to those in which we have determined the death penalty was disproportionate. This Court has held the death penalty to be disproportionate in eight cases: *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), and by *State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any of these cases. Here, there were multiple murder victims and multiple aggravating circumstances. "This Court has never found a sentence of death disproportionate in a case where a defendant was convicted of murdering more than one victim." *State v. Meyer*, 353 N.C. 92, 120, 540 S.E.2d 1, 17 (2000), *cert. denied*, 534 U.S. 839, 151 L. Ed. 2d 54 (2001). Defendant killed elderly and defenseless victims in their own homes. We have previously noted that a murder in one's home is particularly shocking, " 'not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure.' " *State v. Brown*, 357 N.C. 382, 394, 584 S.E.2d 278, 285-86 (2003) (alterations in original), *cert. denied*, 540 U.S. 1194, 158 L. Ed. 2d 106 (2004). Finally, this Court has found that each of the (e)(5), (e)(9), and (e)(11) aggravating circumstances is, standing alone, sufficient to justify the imposition of the death penalty. *See State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). As detailed above, the (e)(5) and (e)(11) aggravating circumstances were found as to all three murders and, in addition, the (e)(9) circumstance was found as to victim Thelma Bowen.

We also compare this case with cases in which we have found the death penalty to be proportionate. *State v. Al-Bayyinah*, 359 N.C. 741, 762, 616 S.E.2d 500, 515 (2005). After a careful review of the record, we conclude that this case "is more analogous to cases in which we have found the sentence of death proportionate than to those cases in which we have found the sentence disproportionate or to those cases in which juries have consistently returned recommendations of life imprisonment." *Id.* We conclude that the sentence of death in the present case is not disproportionate.

**IN RE A.K.**

[360 N.C. 449 (2006)]

Based upon the foregoing, we conclude that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error, and the death sentences in this case are not disproportionate.

NO ERROR GUILT-INNOCENCE PHASE; NO ERROR CAPITAL SENTENCING PROCEEDING; NON-CAPITAL SENTENCING VACATED AND REMANDED FOR RESENTENCING.

Justice MARTIN, concurring.

I concur in the majority's holding that the trial court erred under *Blakely* by increasing defendant's statutory sentence based upon facts which were not found by the jury beyond a reasonable doubt. Furthermore, I acknowledge that *State v. Allen*, 359 N.C. 425, 615 S.E.2d 256 (2005) (holding *Blakely* errors are structural errors and not harmless beyond a reasonable doubt), requires remand of this case for resentencing. I dissented from the majority opinion in *Allen* and maintain that the reasoning of the concurring and dissenting opinion was correct. *Id.* at 452-73, 615 S.E.2d at 274-88 (Martin, J., Lake, C.J., and Newby, J., concurring in part and dissenting in part) (stating that *Blakely* errors are subject to harmless error analysis). Nonetheless, in light of the doctrine of *stare decisis*, I accept *Allen* as controlling and concur in the decision of the majority in the instant case. *See State v. Camacho*, 337 N.C. 224, 235, 446 S.E.2d 8, 14 (1994) (Mitchell, J. (later C.J.), concurring).

Justice NEWBY joins in this concurring opinion.