STATE OF NORTH CAROLINA v. MICHAEL RAY HEINRICY

No. COA06-1068

(Filed 5 June 2007)

**1. Constitutional Law— chemist's report from prior arrest—right of confrontation—business records exception**

A chemist's report from a prior impaired driving conviction in South Dakota was not testimonial, did not violate defendant's confrontation rights, and was admissible under the business records exception to the hearsay rule in this prosecution for second-degree murder, driving while impaired, and other offenses in North Carolina. Moreover, there was no prejudice because the State presented sufficient other evidence of impairment in the South Dakota conviction, as well as evidence of other impaired driving incidents and multiple motor vehicle violations.

**2. Sentencing— aggravated—post-*Blakely*, pre-statute—special verdict**

The trial court did not err in imposing an aggravated sentence after the decision in *Blakely v. Washington*, 542 U.S. 296, but before the statutory amendment, where the court complied with the limitations for a special verdict.

Appeal by defendant from judgment entered 8 November 2005 by Judge Ronald K. Payne in Buncombe County Superior Court. Heard in the Court of Appeals 23 April 2007.

*Roy Cooper, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, for the State.*

*Glover & Petersen, P.A., by Ann B. Petersen, for defendant-appellant.*

MARTIN, Chief Judge.

Michael Ray Heinricy ("defendant") was convicted by a jury of the second degree murder of Clifton Lloyd Turner ("Turner"), driving with no operator's license, driving while impaired, and felony hit and run when personal injury is involved. The trial court arrested judgment on the charges of no operator's license and driving while impaired. Defendant appeals from the judgments entered upon his convictions of second degree murder and felony hit and run.

The State presented evidence tending to show that on 17 March 2005, Officer Dru Cosner observed what he believed to be an illegal drug purchase involving two individuals in a gold Dodge Intrepid. Officer Cosner pulled the vehicle over on Sweeten Creek Road at a gravel driveway thirty feet south of the Hot Spot convenience store. Lieutenant Devin West arrived to offer assistance. The driver was brought back to a drug rehabilitation facility by Lieutenant West and the passenger was arrested. At Officer Cosner's request, a tow truck was dispatched to tow the Dodge Intrepid. Officer Sean Aardema arrived at the scene and parked his patrol car in the Hot Spot parking lot. Clifton Turner arrived with his tow truck and parked in the southbound lane of travel close to the gravel driveway. The tow truck's yellow lights and flashing headlights were in operation to alert oncoming traffic to move into the left lane. The wrecker and its lights were visible to an approaching car at all points within 1325 feet heading southbound on Sweeten Creek Road.

Officer Cosner left to transport his suspect to the jail. Around this time, Officer Victor Morman and Officer Scott Muse arrived and parked their patrol cars in the Hot Spot parking lot. Turner began loading the Dodge onto the tipped down bed of the tow truck when the officers heard a loud crash. The officers turned around to see a 1995 Ford Contour landing top down on the road. The officers got into and positioned their patrol cars to guard the scene. Turner was found lying in the roadway. He had been hit by the Contour and sustained significant injuries. Officer Aardema drove past the wrecker toward defendant, who was on his knees next to the wrecked Contour. Defendant got up and began running into a field. Officer Aardema caught up with and arrested him. Defendant had a strong odor of alcohol and was having difficulty walking. Defendant was taken to the hospital and blood was drawn with his consent. The lab results from his blood sample showed a level of alcohol of 0.19%. In addition, defendant blew a 0.15% on a breathalyzer and failed field sobriety tests administered at the county jail.

Turner died in the emergency room as a result of "massive trauma to the lower extremities and the pelvis." An investigation of the accident scene uncovered tire impressions from the defendant's vehicle on the platform of the wrecker. Defendant told investigators that at 4:45 p.m. on the day of the accident, he went to the Polar Bar, a drinking establishment. Afterward, he went to the Depot Bar, which sells alcohol and has adult entertainment. Defendant then went to McDonald's and purchased three value meals. Defendant did not have a valid North Carolina driver's license.

The State introduced evidence related to defendant's history of drinking and driving, showing that defendant had been convicted of driving while impaired in Buncombe County on 14 August 2003. In addition, he had been convicted of driving while impaired in South Dakota on 11 April 2001, and of refusing to take an implied consent test in Minnesota, after having operated a commercial vehicle while having the odor of alcohol about his person.

Defendant testified in his own behalf, admitting each of his prior convictions caused by alcohol consumption and driving. On 17 March 2005, he went to the Polar Bar. At the bar, defendant drank three or four beers. He left around 7:30 p.m. and went to the Depot Bar where he drank a beer or two and a drink called a Derailer. After leaving the bar, defendant picked up food at McDonald's. Defendant testified that as he approached the Hot Spot, he was looking down while searching for french fries. Immediately before the accident, defendant noticed

the patrol cars in the Hot Spot parking lot. Defendant did not remember specifics related to the accident.

I.

[1] Defendant argues that the trial court committed reversible error in admitting the affidavit of a chemist, Brad Johnson, containing defendant's blood alcohol level stemming from his 2001 DWI conviction in South Dakota. Specifically, defendant contends that the challenged affidavit (1) was inadmissible hearsay that cannot qualify under the business records exception and (2) violated defendant's state and federal constitutional right to confrontation. At trial, defendant objected to the affidavit's admission only "on proffered grounds, due process and confrontation." As a result of defendant's failure to object to the admission of the evidence as hearsay, he may not now argue that the evidence does not qualify under the business records hearsay exception. *State v. Brigman*, 178 N.C. App. 78, 90-91, 632 S.E.2d 498, 506 (2006).

Testimonial statements of a witness absent from trial may be admitted only where the declarant is unavailable, and only where defendant has had a prior opportunity to cross-examine. *Crawford v. Washington*, 541 U.S. 36, 59, 158 L. Ed. 2d 177, 197 (2004). At trial, a *voir dire* hearing was held concerning the admissibility of the affidavit. No evidence was submitted suggesting that the defendant had a prior opportunity to cross-examine Brad Johnson. Therefore, we must determine whether the affidavit in this case is testimonial in nature and, thus, inadmissible under *Crawford*. We hold that the affidavit is nontestimonial in nature and does not violate defendant's rights to confrontation.

*Crawford* provided only a limited definition of "testimonial" evidence, indicating that at a minimum, the term covered "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68, 158 L. Ed. 2d at 203. It was, however, suggested in *dicta* that business records were not testimonial in nature. *Id.* at 56, 158 L. Ed. 2d at 195-96 (describing hearsay exceptions as covering "statements that by their nature were not testimonial—for example, business records[.]") "[B]usiness records are neutral, are created to serve a number of purposes important to the creating organization, and are not inherently subject to manipulation or abuse." *State v. Forte*, 360 N.C. 427, 435, 629 S.E.2d 137, 143 (2006). Our Supreme Court has previously held that a chemical analyst's affidavit provides one example of "the sort of evidence

that the traditional business and public records exceptions to the hearsay rule intended to make admissible." *State v. Smith*, 312 N.C. 361, 374-75, 323 S.E.2d 316, 324 (1984).

Following *Crawford*, our Courts have held that business records, even when created for law enforcement purposes, are nontestimonial in nature.

> [L]aboratory reports or notes of a laboratory technician prepared for use in a criminal prosecution are nontestimonial business records only when the testing is mechanical, as with the Breathalyzer test, and the information contained in the documents are objective facts not involving opinions or conclusions drawn by the analyst.

*State v. Cao*, 175 N.C. App. 434, 440, 626 S.E.2d 301, 305 (2006). In *Cao*, the defendant twice sold crack cocaine to an undercover detective. *Id.* at 435, 626 S.E.2d at 302. The detective sealed the drugs and sent them to a testing laboratory technician. *Id.* at 435-36, 626 S.E.2d at 302. At trial, the technician did not testify and the detective read into evidence the technician's laboratory reports identifying the evidence as cocaine. *Id.* at 436, 626 S.E.2d at 302. This Court concluded that the record did not contain the necessary information about the procedures used to identify the presence of cocaine in a substance so as to ascertain whether the testing was "mechanical" and whether the information contained in the report was limited to "objective facts." *Id.* at 440, 626 S.E.2d at 305; *see also State v. Melton*, 175 N.C. App. 733, 739, 625 S.E.2d 609, 613 (2006) (applying the *Cao* analysis, this Court was unable to determine whether a laboratory report diagnosing the defendant with genital herpes was arrived at through mechanical means). This Court in both *Cao* and *Melton* held that regardless of the admissibility of the lab reports, any error in their admission was harmless beyond a reasonable doubt. *Cao*, 175 N.C. App. at 440-41, 626 S.E.2d at 305; *Melton*, 175 N.C. App. at 739, 625 S.E.2d at 613.

In addition, our Supreme Court has upheld a nonmechanical report as nontestimonial where the prosecution sought the admission of a lab report examining samples and identifying fluids. *See Forte*, 360 N.C. at 437, 629 S.E.2d at 144. The report was described as an objective analysis of the evidence, along with routine chain of custody information, that did not bear witness against a defendant. *Id.* at 435, 629 S.E.2d at 143. The agent who prepared the report was found to have no interest in the trial's outcome. *Id.* Ultimately, the report

was found to be "neutral, having the power to exonerate as well as convict." *Id.*

Here, the State called the arresting officer from defendant's 2001 DWI conviction, former deputy sheriff Jeff Merrill ("Merrill"). During his testimony, Merrill was asked to identify the affidavit of Brad Johnson, the chemical analyst:

Q: What I'm showing you now I've marked for identification purposes as State's Exhibit 56, and see if you can recognize that affidavit of a Mr. Brad Johnson.

A: Yes.

Q: And what is that affidavit of Mr. Brad Johnson?

A: It's the percentage of alcohol—percentage of weight of ethanol in his bloodstream.

Q: And he signed the authentication of this document?

. A: Yes.

Q: And he signed it when?

A: January 12th, 2001.

Q: And on Block No. 2 it lists on the top of that page—would you read that out?

A: "That on 12-8 of 2000 I received custody of sample submitted by Merrill by direct deposit of the Sioux Falls Police Department, Identification Section locked box. Said sample is identified as a sample from [defendant], 008316. This sample is assigned to Laboratory Sample No. 2000120801H for identification purposes."

Q: And the third sentence, what does that mean?

A: "That in my capacity as a degreed chemist I tested the above using gas chromatograph head space method on 12-12-2000, which the results of my examination is [sic] as follows: The exhibit contains 0.17 percent by weight ethanol alcohol."

Brad Johnson determined defendant's blood alcohol content using the gas chromatograph head space method. Special Agent Aaron Joncich, tendered as an expert in forensic chemistry, described in detail a seemingly similar process used to arrive at defendant's

blood alcohol level on 17 March 2005. Much like the lab report in *Forte*, Johnson's affidavit was limited to his objective analysis of the evidence and routine chain of custody information. Although the affidavit was prepared with the understanding that its use in court was probable, Johnson had no interest in the outcome of the trial. The affidavit was nontestimonial and properly admitted.

As in *Cao* and *Melton*, even assuming, *arguendo*, the admission of the chemist's affidavit was error, we conclude that any error was harmless beyond a reasonable doubt. The test for prejudicial error is whether there is "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443(a) (2005). Prior to the admission of Brad Johnson's affidavit, the trial court issued an instruction limiting the evidence to proof of malice sufficient for second degree murder. *See State v. Edwards*, 170 N.C. App. 381, 386-87, 612 S.E.2d 394, 397 (2005) (indicating that evidence of prior DWI and other traffic offenses is admissible to show the malice necessary to support a second degree murder conviction). Here, the State presented sufficient evidence of impairment relating to the South Dakota DWI charge beyond defendant's blood alcohol level. Merrill testified as to defendant's admission that he consumed two Black Russians, defendant's failure to satisfactorily perform field sobriety tests and Merrill's overall opinion that defendant was impaired. In addition, the State presented evidence of multiple motor vehicle law violations, such as speeding and driving on a sidewalk in a commercial vehicle. The defendant admitted to driving a commercial vehicle after drinking in Minnesota and refusing to have his blood alcohol level tested. Evidence was also entered of defendant's August 2003 DWI conviction in Buncombe County.

Q: Mr. Heinricy, it didn't take the first time that you were stopped for driving while impaired in Minnesota, it didn't take the second time that you were stopped for driving while impaired in South Dakota, and it didn't take the third time that you were stopped for driving while impaired in North Carolina to change your attitude and feelings on the effects of you drinking and driving. Is that what you're telling these folks right here? It took you killing somebody to change your feelings about consuming alcohol and driving?

A: Just that I was hard headed and didn't learn.

Defendant's assignment of error is overruled.

II.

[2] Next, defendant contends the trial court erred in imposing an aggravated sentence for second degree murder. In *Blakely v. Washington*, 542 U.S. 296, 301, 159 L. Ed. 2d 403, 412 (2004), the Supreme Court held that a defendant's constitutional right to a jury trial requires that jurors find, beyond a reasonable doubt, facts which increase the penalty for a crime "beyond the prescribed statutory maximum." "Statutory maximum" was defined as "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Id.* at 303, 159 L. Ed. 2d at 413 (emphasis removed). The North Carolina Legislature responded, amending N.C.G.S. § 15A-1340.16 on 30 June 2005 to comply with the holding in *Blakely*.

Defendant's indictment relating to the second degree murder charge alleged that "[t]he defendant knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person." N.C. Gen. Stat. 15A-1340.16 (d)(8) (2006). The trial court submitted this alleged aggravating factor to the jury. The jury found this aggravating factor to be proven beyond a reasonable doubt and the defendant was sentenced accordingly. Defendant argues that because the crime occurred prior to the effective date of the amended N.C.G.S. § 15A-1340.16, no court had jurisdiction or power to impose a sentence in the aggravated range.

In *State v. Johnson*, 181 N.C. App. 287, 639 S.E.2d 78 (2007), this Court addressed essentially the same question presented here, that of whether the trial court took the appropriate steps to submit aggravating factors to a jury following the *Blakely* decision but prior to the effective date of N.C.G.S. § 15A-1340.16 (2006).

Defendant does not assert that the trial court violated his rights under *Blakely*, but that the trial court acted without authority when it fashioned its own remedy to comply with *Blakely* before our legislature had amended the structured sentencing act. However, the North Carolina Supreme Court recently addressed this issue, where "the trial court allegedly lacked a procedural mechanism by which to submit the challenged aggravating factor to the jury," and concluded that North Carolina law "permits the submission of aggravating factors to a jury using a special verdict." *State v. Blackwell*, 361 N.C. 41, 46, 638 S.E.2d 452, 456 (2006).

A special verdict is a common law procedural device by which the jury may answer specific questions posed by the trial judge that are separate and distinct from the general verdict. Despite the fact that the General Statutes do not specifically authorize the use of special verdicts in criminal trials, it is well-settled under our common law that special verdicts are permissible in criminal cases. Special verdicts, however, are subject to certain limitations. After the United States Supreme Court decision in *United States v. Gaudin*, [515 U.S. 506, 115 S.Ct. 2510, 132 L.Ed. 2d 444 (1995)] a special verdict in a criminal case must not be a true special verdict—one by which the jury only makes findings on the factual components of the essential elements alone—as this practice violates a criminal defendant's Sixth Amendment right to a jury trial. Thus, trial courts using special verdicts in criminal cases must require juries to apply law to the facts they find, in some cases straddl[ing] the line between facts and law as a mini-verdict of sorts. Furthermore, requests for criminal special verdicts must require the jury to arrive at its decision using a beyond a reasonable doubt standard, since a lesser standard such as preponderance of the evidence would violate a defendant's right to a jury trial. Aside from these limitations, however, we are aware of no limits on our trial courts' broad discretion to utilize special verdicts in criminal cases when appropriate. It is difficult to imagine a more appropriate set of circumstances for the use of a special verdict than those existing in the instant case, in which a special verdict in compliance with the above limitations would have safeguarded defendant's right to a jury trial under *Blakely* . . . . [P]rior to the Blakely Act, special verdicts were the appropriate procedural mechanism under state law to submit aggravating factors to a jury.

*Johnson*, 181 N.C. App. at 293, 639 S.E.2d at 81-82 (quoting *Blackwell*, 361 N.C. at 46-49, 638 S.E.2d at 456-58). As in *Johnson*, we conclude that the trial court complied with the limitations for a special verdict and we overrule defendant's assignment of error.

No error.

Judges STEELMAN and STEPHENS concur.