[Cite as *State v. Crager*, 116 Ohio St.3d 369, 2007-Ohio-6840.]

THE STATE OF OHIO, APPELLANT, *v.* CRAGER, APPELLEE.

[Cite as *State v. Crager*, 116 Ohio St.3d 369, 2007-Ohio-6840.]

*Criminal law – Evidence — Confrontation Clause – "Testimonial" evidence requiring opportunity for cross-examination by accused – DNA analysis conducted at request of prosecutor in anticipation of trial that identifies victim's blood on defendant's clothing is not "testimonial" for purposes of Confrontation Clause – DNA-analysis report admissible when preparer of analysis does not testify at trial and qualified expert testifies in her place.*

(Nos. 2006-0294 and 2006-0298 — Submitted January 24, 2007 — Decided December 27, 2007.)

APPEAL from and CERTIFIED by the Court of Appeals for Marion County, No. 9-04-54, 164 Ohio App.3d 816, 2005-Ohio-6868.

_____

**SYLLABUS OF THE COURT**

1. Records of scientific tests are not "testimonial" under *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177.

2. A criminal defendant's constitutional right to confrontation is not violated when a qualified expert DNA analyst testifies at trial in place of the DNA analyst who actually conducted the testing.

_____

**O'CONNOR, J.**

**{¶ 1}** This appeal requires us to examine issues concerning the extent that the admission into evidence of records of scientific tests (such as DNA reports) in a criminal trial implicates the Confrontation Clause of the Sixth Amendment to the United States Constitution. Our precedent in *State v. Craig,* 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, strongly supports the

conclusion that the DNA reports in this case are not "testimonial" as that term is defined in *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. Furthermore, although there is a split of authority among other jurisdictions on the issues we resolve, the better-reasoned cases hold that records of scientific tests like those involved here are not "testimonial." We therefore reverse the judgment of the court of appeals.

I

{¶ 2} On April 10, 2004, Esta Boyd's body was found in the bedroom of her home in Marion. The crime scene was bloody; the coroner found that Boyd had suffered multiple blows to the head, which caused subarachnoid hemorrhaging. He estimated that she had been dead for one to three days when found. A witness testified that when he had talked to Boyd at around 7:30 or 8:00 on the evening of April 7, Boyd told him that she was "sitting there talking to Lee." Defendant-appellee, Lee Crager, was an acquaintance of Boyd; Crager's father and Boyd were close friends. The last person to hear from Boyd spoke to her at around 8:45 on April 7.

{¶ 3} By the time Boyd's body was discovered, Crager was already in jail. He had been arrested on April 8, 2004, at around 8:30 p.m. for failing to pay his bill at Mikey's Pizza. The arresting officer reported that Crager was intoxicated and had blood on his pants and on one of his knuckles. On April 10, 2004, officers went to the Multi-County Correctional Center to recover Crager's clothing and to photograph him. Crager had cuts on the knuckles of his right hand and scratches on the inner portion of his right forearm.

{¶ 4} Laboratory testing on Crager's shirt revealed that it contained human blood stains, which contained Boyd's DNA. Testing conducted on a ring worn by Boyd revealed the presence of Crager's DNA. Cigarette butts found in an ashtray in Boyd's bedroom contained Boyd's and Crager's DNA.

{¶ 5} Other evidence pointed to Crager's presence in Boyd's home. Two palm prints from Crager were found on a mirror in Boyd's bedroom, and his thumb print was found on a beer can recovered from her home. A witness testified that he had seen Crager walking toward Boyd's house at about 5:00 p.m. on April 7. Detectives discovered that the last phone call made from Boyd's phone had been made to the Marion Area Counseling Center. The Marion Area Counseling Center had received a call from Crager between 11:30 a.m. and 12:30 p.m. on April 8.

{¶ 6} Evidence established that the killer likely was in Boyd's house for a significant period of time. Phone records indicated that Boyd's phone was used to call phone sex-line numbers on April 8 at 3:54 a.m., 10:04 a.m., 1:04 p.m., 1:06 p.m., and 1:08 p.m. There were a number of empty beer cans and an empty whiskey bottle found in the building, but testimony established that Boyd rarely drank alcoholic beverages. There were 22 cigarette butts in an ashtray in Boyd's bedroom, but testimony revealed that Boyd generally did not permit smoking in her house.

{¶ 7} The case proceeded to a jury trial. Based on the way this case comes to us, the state's presentation of DNA evidence at trial is the focal point for resolving the issues presented. Therefore, we recount the way that evidence was presented in considerable detail.

{¶ 8} The state introduced the DNA evidence in its case against Crager through the testimony of DNA expert Steven M. Wiechman of the Bureau of Criminal Identification and Investigation ("BCI"). Jennifer Duvall, the DNA analyst who prepared the two DNA reports at issue, was on maternity leave at the time of trial and did not testify.

{¶ 9} Shortly before the state called Wiechman to the witness stand, Crager's defense attorney moved, outside of the presence of the jury, to prevent Wiechman from testifying regarding any DNA evidence. Counsel argued solely

that Wiechman's testimony was hearsay because "Mr. Wiechman did not conduct the testing, he did not remove any samples to be tested, he did not do the actual calculations. * * * I don't see how he can testify to what someone else did."

{¶ 10} As the record makes evident, defense counsel's opposition to Wiechman testifying was solely based on hearsay grounds, not on the Confrontation Clause. Furthermore, counsel did not object to the admission into evidence of the DNA reports themselves, but argued only that Wiechman should not be permitted to testify because he was not the DNA analyst who actually performed the tests and signed the report.

{¶ 11} In response, the prosecutor asserted that the DNA reports were business records and that Wiechman did a "technical review" of Duvall's work to ensure "the integrity of the process." The prosecutor further argued that, as with any other business record, when "someone * * * makes a documentation, another witness can testify to it because it's done in the normal and ordinary course of business." The trial court denied defense counsel's motion and allowed Wiechman to testify, stating, "You can ask him – ask Mr. Wiechman anything you want about 'these aren't your calculations', I will give you plenty of leeway on that."[1]

{¶ 12} Wiechman testified as to his qualifications, education, training, and experience as a DNA expert. He stated that Crager's trial was the 36th time that he had testified as an expert witness and that he had conducted DNA testing for "hundreds of cases." He testified about the history and fundamentals of DNA testing and described safeguards in place to ensure the accuracy of all DNA tests

---

1. After the trial court's ruling, but prior to Wiechman's testimony, the state offered the testimony of BCI analyst Mark Losko, a forensic scientist in the DNA/Serology section of BCI, who did the serology work in this case. Losko testified that analysts in the serology section "examine the evidence and try to identify the stain of interest, whether it be blood, semen, or saliva. We obtain those samples for DNA testing." Losko discussed some of the items upon which DNA testing was conducted by Duvall and explained how he obtained the samples from the items for testing. Losko's serology reports were admitted into evidence as State's Exhibits 54 and 55.

done at BCI, including a requirement that each analyst must pass a "proficiency test" twice a year, which involves analyzing a special test sample, drawing conclusions, and then submitting the test sample results to be evaluated for accuracy. Wiechman further testified that BCI is accredited by the American Society of Crime Laboratory Directors, Laboratory Accreditation Board.

{¶ 13} Wiechman then explained the DNA testing review process that BCI does in every case: "Once a case is completed by an analyst it is actually gone through [sic] two review processes. One is a technical review process, and the other is an administrative process. With regards to the technical review, another qualified analyst would actually check the work of another analyst to determine whether they followed all the correct procedures, whether they agree with their case approach, anything that that analyst did, another analyst would look at and would have to agree with, and then in turn sign off on that particular case.

{¶ 14} "Once that is completed there is what's called an administrative review which a Supervisor would look at a case and basically make sure there [are] no mistakes, that pretty much everything has been followed. Then once those two review processes have been done, then the case actually goes out the door and is sent to a requesting agency. But on 100 percent of the cases that is what is done."

{¶ 15} Wiechman stated that the review process is in place to ensure accuracy and reliability. "Mistakes can be made, typos can be made. But to have those safeguards in place insures that there's reliability within those results." Wiechman testified that in some circumstances DNA testing "can be quite lengthy depending upon what you're looking at." He further stated that DNA testing is not done on every item of evidence, "[b]ecause of the volume of cases that we get, and because of so many requests. It's virtually impossible to test every single

stain on every piece of evidence. It's just not only inefficient as far as case approach goes, but it's also very costly."

{¶ 16} Wiechman testified that each case from the state includes a "case synopsis," which explains "what happened in the case and what questions does the [Police] Department have, and what they're trying to answer with regard to the physical evidence that they have submitted." BCI personnel also consult with law enforcement and "sometimes the Prosecutor" to identify the information that "will be of use to us to help guide us in determining what samples to look at, and that's what was done in this particular case." Furthermore, there is "give and take" between BCI and the requesting agency as to what is tested, and "ultimately it's the Prosecutor's decision on what we'll actually look at."

{¶ 17} Wiechman informed the jury that in this case BCI conducted DNA testing at law enforcement's request. He stated that he was not the analyst who did the testing, but that Duvall did the testing and he "technically reviewed it."

{¶ 18} Wiechman testified that his technical review of Duvall's work involved reviewing her notes, the DNA profiles she generated, her conclusions, and the final report, which consisted of "all the findings that she had within this case. I actually technically reviewed that and made sure that the decisions or conclusions that she came up with were consistent and were supported by her work that she did."

{¶ 19} Wiechman stated that when he did the technical review, he did not know when the case would be tried or that he would be testifying. He explained his review of the DNA "profiles" by stating:

{¶ 20} "The profiles that are generated on the knowns and unknowns are basically what we call electrophrerograms, they're basically charts. From those charts there's actually a sheet that [the analyst] determines what the profile is. I will, in turn, once she has completed her analysis I will, in fact, independently verify the correct calls that she made, or, she said 'this is what the profile is', I

6

will actually go back and verify yes, in fact, she made the correct calls or correct decision on what this profile was."

**{¶ 21}** Wiechman stated that he had looked at the same data Duvall looked at and that he had come to the same conclusions. In response to a question regarding the procedure for resolving a possible discrepancy, Wiechman testified:

**{¶ 22}** "If there's a discrepancy between the technical reviewer and the analyst, then they can get together and meet and say, 'Okay, I think this' or 'I think this', and then if a consensus still isn't reached there then it can actually either go to — what we have is a Forensic Science Coordinator, or another person that can be consulted, or it can actually go to the supervisor who will in turn say, 'Okay, yes, I believe that this person is correct or this interpretation is correct or you're both right' and you can come to a consensus that way." Wiechman stated that there were no discrepancies in this case.

**{¶ 23}** Wiechman's testimony then focused on two "rounds" of DNA testing, both of which were done by Duvall, which resulted in two separate DNA reports. State's Exhibit 56 was the first report, detailing the results of testing done on a stain on Crager's shirt that revealed Boyd's DNA. Wiechman testified that the frequency of occurrence of Boyd's DNA profile was "1 in 1.028 quintillion people." State's Exhibit 57 was the second, later, report, detailing the results of testing done on Boyd's ring and on cigarette butts taken from the victim's bedroom. Testing of the ring revealed Crager's DNA. Wiechman testified that the frequency of occurrence of the DNA found on the ring was one in 7.8 million people. Testing of the cigarette butts also revealed Crager's DNA. Wiechman testified that the frequency of occurrence of the DNA found on one of the cigarette butts was one in 13.7 quadrillion people.

**{¶ 24}** On cross-examination, Wiechman stated that he "actually technically reviewed the second [round of testing], but in preparation for court I reviewed, unofficially to prepare for testimony, I reviewed the entire case file."

He agreed with defense counsel's statements that DNA testing is limited to revealing "what something is * * * and perhaps who it came from" and cannot reveal "how it got there." Wiechman further elaborated:

{¶ 25} "All I can say is that this particular DNA profile is on this particular piece of evidence, and this person may or may not have contributed that stain or that profile. * * * I guess in general terms you can't really say 'okay, this DNA got on this particular item in this particular time' or even within a certain window. All you can say [is] 'this is what I found, it's consistent with these people' or 'not consistent with these people. Here are my conclusions', and that's what we report."

{¶ 26} On redirect, Wiechman stated that the purpose of a DNA test is not to match a particular individual: "The test is just to produce a profile. When you actually do the comparison, that is when you determine whether or not a person may or may not have contributed to that stain." Further, "[y]ou have no idea when you're doing the analysis if you're gonna get one person, if you're gonna get two, if you're gonna get three. I've had cases where you get lots of people in a particular stain. You just don't know until you actually do the analysis. When you sit down and do your interpretation of the data and then make the comparison between the knowns and the unknowns. Then you can determine 'yes, this came from a person that's consistent with this person, it's not consistent with that person'. That's actually after you do the physical bench work. Then you sit down and you interpret your data. * * * [T]he actual data is presented in the report and then there's paragraph form data that actually explains what that data means."

{¶ 27} On recross, Wiechman explained the extent of the DNA testing that yielded the DNA of only two persons (Boyd and Crager) on the items tested. In response to defense counsel's questions, Wiechman explained that the "synopsis" provided by whoever requests testing, which sets forth the details of

the case, does not dictate the results: "I make that determination [that the DNA was consistent with Boyd and Crager] based on the data that I have, that it supports that conclusion that it's consistent with these two people. So although we take the synopsis into consideration, when we're making our interpretation of the data, that's when the conclusion is drawn. * * * [A]ll of the profiles obtained in this case could be explained with one interpretation, this interpretation in this case consistent with these two people." Wiechman also stated that some items that could have been tested were not, because testing is done only on those items that are "requested to be tested."

{¶ 28} On final redirect, Wiechman clarified that the synopsis presented to BCI by law-enforcement personnel when they request testing is not a factor BCI's experts rely on in reaching their determinations: "The interpretation is made based upon the data that's obtained in the case. The synopsis is only to guide us and to help support the findings that we have."

{¶ 29} The prosecutor then asked, "[I]f law enforcement said to you, 'Hey, we are satisfied it's Lee Crager, and that's the only one person's DNA we want you to look for', would you do the test that way?" Wiechman responded:

{¶ 30} "No. * * * [W]e're an unbiased agency. So we're not looking for any one particular person. We're saying 'okay, these are the items that you're requesting us to perform DNA analysis on, these are what we'll do'. I have no idea what we have, we'll present the evidence or the findings that we have, and if that's sufficient then perhaps no other request will be made. If it's not sufficient and they feel additional testing's required, then they can request that. But at this time once we based our conclusions on the data that we had, based on those two rounds of testing, it was determined by [the prosecutor's] office that that was sufficient for him, and that's what was done."

{¶ 31} Finally, in response to a question regarding whether the amount of DNA testing done in this case was "more or less than [is] typically done in similar

cases," Wiechman stated, "Depending on the complexity, this is probably about average."

{¶ 32} At the conclusion of the jury trial, Crager was found guilty of aggravated murder and aggravated burglary. Upon Crager's appeal, the court of appeals reversed the judgment of the trial court and remanded for further proceedings, concluding that the DNA report was testimonial and that Crager's Sixth Amendment right to confrontation had been violated. Based on that determination, the court of appeals found other assignments of error moot and did not address them.

{¶ 33} This court accepted the court of appeals' certification of a conflict and ordered the parties to brief the issue as stated in the court of appeals' journal entry:

{¶ 34} "Are records of scientific tests, conducted by a government agency at the request of the State for the specific purpose of being used as evidence in the criminal prosecution of a specific individual, 'testimonial' under *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354 [158 L.Ed.2d 177]?" 109 Ohio St.3d 1421, 2006-Ohio-1967, 846 N.E.2d 532.

{¶ 35} In the case certified as being in conflict, *State v. Cook*, 6th Dist. No. WD-04-029, 2005-Ohio-1550, ¶ 19-20, the Sixth District Court of Appeals held that law-enforcement records of checks done on a breath-alcohol testing machine and of the qualifications of the officer who was the custodian of those records were not testimonial under *Crawford,* because they bore "no similarities to the types of evidence the Supreme Court labeled as testimonial" and also because the records qualified as business records under Evid.R. 803(6), "which, at least according to dicta in *Crawford*, are not testimonial."

{¶ 36} We also accepted a discretionary appeal, 109 Ohio St.3d 1423, 2006-Ohio-1967, 846 N.E.2d 533, on one of the state's propositions of law, which asserts:

{¶ 37} "A criminal defendant's constitutional right to confrontation is not violated when a DNA analyst testifies at his trial in place of the DNA analyst who conducted the DNA testing. Neither records which are admissible under the business records exception to the rule against hearsay nor expert testimony, are testimonial under *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354 [158 L.Ed.2d 177]."

II

{¶ 38} The starting point for our analysis is that the DNA reports admitted into evidence in this case were "business records," under the hearsay exception of Evid.R. 803(6). The reports were made "from information transmitted by, a person with knowledge, [and are] kept in the course of a regularly conducted business activity," and it "was the regular practice of that business" (BCI) to make the reports. Furthermore, the reports were introduced through the testimony of a "qualified witness" (Wiechman) and nothing suggests that the "method or circumstances of preparation indicate lack of trustworthiness." See *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 81-82 (autopsy reports are business records).

{¶ 39} This case presents the issue whether the DNA reports, even though properly admissible as business records under the applicable exception to the hearsay rule, might nevertheless violate the Sixth Amendment to the United States Constitution, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."

{¶ 40} Prior to the United States Supreme Court's *Crawford* decision, the determination that the DNA reports were business records would have ended the inquiry under the Confrontation Clause and resulted in the conclusion that Crager's right to confrontation was not violated. The Supreme Court had held in *Ohio v. Roberts* (1980), 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597, that an unavailable witness's out-of-court statement against a criminal defendant was not

barred by the Confrontation Clause if it bore adequate "indicia of reliability," i.e., if it fell within a "firmly rooted hearsay exception," or it bore "particularized guarantees of trustworthiness." The DNA reports in this case, as Evid.R. 803(6) business records, satisfy the *Roberts* test.

{¶ 41} However, *Crawford* overruled *Roberts* by establishing in its place a new and very different approach. In *Crawford*, 541 U.S. at 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177, the Supreme Court held that "testimonial" out-of-court statements presented in a criminal trial violate the Confrontation Clause unless the witness was unavailable to testify at trial and the defendant had a prior opportunity to cross-examine the witness. After *Crawford*, the key inquiry for Confrontation Clause purposes is whether a particular statement is testimonial or nontestimonial.

{¶ 42} The *Crawford* court stated, "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford* at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177; see also *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 59 (only testimonial statements implicate the Confrontation Clause).

{¶ 43} *Crawford* noted that "not all hearsay implicates the Sixth Amendment's core concerns," id. at 51, 124 S.Ct. 1354, 158 L.Ed.2d 177, and that its holding did not apply to all hearsay, because many statements entered into evidence pursuant to hearsay exceptions are "not testimonial—for example, business records or statements in furtherance of a conspiracy," id. at 56, 124 S.Ct. 1354, 158 L.Ed.2d 177. See also *Davis v. Washington* (2006), 547 U.S. 813, ___, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (nontestimonial hearsay, "while subject to

traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause").

{¶ 44} The *Crawford* court, 541 U.S. at 51-52, 124 S.Ct. 1354, 158 L.Ed.2d 177, noted three "formulations" of a "core class" of testimonial statements: " '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' Brief for Petitioner 23; 'extrajudicial statements * * * contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' *White v. Illinois*, 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment); [and] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 3."

{¶ 45} In *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at paragraph one of the syllabus, this court adopted the third "formulation" to hold that "[f]or Confrontation Clause purposes, a testimonial statement includes one made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " Id., quoting *Crawford,* id. *Stahl* has no application here because *Stahl* involved the testimonial nature of actual oral "statements" of a declarant and did not involve records of scientific tests or the business-records exception to the hearsay rule.[2] Furthermore, as explained below, a statement is not "testimonial" merely because

---

2. Our recent decision in *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, 2007 WL 3121283, involved statements made by a witness to a police officer during interrogation, and therefore is distinguishable from the instant case.

it may reasonably be expected to be introduced at a later trial, although that may be a proper consideration in certain other situations involving specific oral statements of a declarant.

{¶ 46} In *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, we concluded that the defendant's Confrontation Clause rights were not violated when an autopsy report prepared by a doctor who did not testify at trial was entered into evidence, and a different doctor provided expert testimony about the autopsy after reviewing the report and supporting materials. As to the testifying doctor in *Craig*, this court held that her expert testimony did not violate the defendant's right to confrontation, because the jury was fully aware that she had not personally conducted or been present at the autopsy and because the defense had the opportunity to question her "about the procedures that were performed, the test results, and her expert opinion about the time and cause of death." Id. at ¶ 79. We further held that the autopsy report was properly admitted as a business record under Evid.R. 803(6). Id. at ¶ 80.

{¶ 47} We based our decision in *Craig* in part on the *Crawford* court's statement that "business records are, 'by their nature,' not testimonial." *Craig*, at ¶ 81, quoting *Crawford*, 541 U.S. at 56, 124 S.Ct. 1354, 158 L.Ed.2d 177. We reasoned: "An autopsy report, prepared by a medical examiner and documenting objective findings, is the 'quintessential business record.' *Rollins v. State* (2005), 161 Md.App. 34, 81, 866 A.2d 926. 'The essence of the business record hearsay exception contemplated in *Crawford* is that such records or statements are not testimonial in nature because they are prepared in the ordinary course of regularly conducted business and are 'by their nature' not prepared for litigation.' *People v. Durio* (2005), 7 Misc.3d 729, 734, 794 N.Y.S.2d 863.

{¶ 48} "Most jurisdictions that have addressed the issue under *Crawford* have found that autopsy reports are admissible as nontestimonial business or public records. See *Moreno Denoso v. State* (Tex.App.2005), 156 S.W.3d 166,

14

180-182 (autopsy report was not testimonial and was admissible without the deceased pathologist's testimony); *Durio*, 7 Misc.3d at 734-737, 794 N.Y.S.2d 863 (autopsy report was nontestimonial and its admission without the testimony of the medical examiner who performed the autopsy did not violate *Crawford*); *State v. Cutro* (2005), 365 S.C. 366, 378, 618 S.E.2d 890 (autopsy report was nontestimonial).

**{¶ 49}** "* * *

**{¶ 50}** "We agree with the majority view under *Crawford* and conclude that autopsy records are admissible as nontestimonial business records." *Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, at ¶ 82-83 and 88.

**{¶ 51}** The autopsy report at issue in *Craig* is not distinguishable from the DNA reports in this case. Like that autopsy report, the DNA reports here are nontestimonial. We reject the position that these DNA reports are different because the lab work that produced them was done at the request of the prosecution or because it was reasonably expected that the reports would be used in a criminal trial.

**{¶ 52}** Although BCI's statutory mission under R.C. 109.52 is to "aid" law enforcement in solving crimes, BCI is not itself an "arm" of law enforcement in the sense that the word implies a specific purpose to obtain incriminating results. As the testimony of Wiechman detailed above demonstrates, although BCI conducts tests at the request of law-enforcement personnel or other entities affiliated with the state, BCI maintains its independence to objectively test and analyze the samples it receives.

**{¶ 53}** Furthermore, BCI's analysis and testing are not intended to arrive at a predetermined result. If that were the case, then BCI would have no credibility and would be unable to maintain its accreditation. Rather, BCI's testing can both include and exclude suspected potential donors from the DNA pool, as Wiechman's testimony recounts. Therefore, there is nothing inherently

untrustworthy about the tests conducted by BCI. We decline to create standards that would evaluate scientific tests conducted by BCI differently than we would evaluate similar tests conducted by a private laboratory. The same standards also should apply when the state wishes to use scientific tests conducted at the request of a criminal defendant against that defendant.

{¶ 54} Although it could have been reasonably expected that the DNA reports would be used in a criminal trial, that consideration was also present with the autopsy report in *Craig*. As in *Craig*, the scientific-test reports in this case were prepared in the ordinary course of regularly conducted business and so were not testimonial.

{¶ 55} We fully agree with those courts that have rejected arguments regarding the "testimonial" nature of scientific-test reports such as the DNA reports involved in this case.

{¶ 56} In holding that serology reports were properly admitted even though the analyst who prepared the reports did not testify, the Supreme Court of North Carolina stated in *State v. Forte* (2006), 360 N.C. 427, 435, 629 S.E.2d 137: "Under the Supreme Court's analysis [in *Crawford*], the reports at issue here are not testimonial. They do not fall into any of the categories that the Supreme Court defined as unquestionably testimonial. These unsworn reports, containing the results of [the preparer's] objective analysis of the evidence, along with routine chain of custody information, do not bear witness against defendant. * * * Instead, they are neutral, having the power to exonerate as well as convict. Although we acknowledge that the reports were prepared with the understanding that eventual use in court was possible or even probable, they were not prepared exclusively for trial and [the preparer] has no interest in the outcome of any trial in which the records might be used."

{¶ 57} In *People v. Brown* (2005), 9 Misc.3d 420, 424, 801 N.Y.S.2d 709, the court reasoned:

16

**{¶ 58}** "The notes and records of the laboratory technicians who tested the DNA samples in this case were not made for investigative or prosecutorial purposes but rather were made for the routine purpose of ensuring the accuracy of the testing done in the laboratory and as a foundation for formulating the DNA profile.

**{¶ 59}** "* * * [T]he notes of the many laboratory personnel who conducted the four steps of DNA profiling over several days were made during a routine, non-adversarial process meant to ensure accurate analysis and not specifically prepared for trial. Because DNA testing requires multiple steps done by multiple technicians over multiple days, all of the steps in the process must be documented for the benefit of supervisors and technicians who perform subsequent testing functions."

**{¶ 60}** This case is very similar to *People v. Geier* (2007), 41 Cal.4th 555, 61 Cal.Rptr.3d 580, 161 P.3d 104, a recent decision of the Supreme Court of California. In a thorough and well-reasoned opinion, the *Geier* court specifically held that the DNA report at issue in that case was not testimonial for Confrontation Clause purposes and so the defendant's Sixth Amendment rights were not violated by its admission into evidence. Id. at 607, 61 Cal.Rptr.3d 580, 161 P.3d 104.

**{¶ 61}** In *Geier*, the prosecution contracted with a private laboratory to conduct DNA testing. The prosecution's DNA expert—who did not personally conduct the testing but did sign the report as the supervisor of the biologist who did the actual testing—testified that in her opinion DNA extracted from vaginal swabs taken from the victim matched a sample of the defendant's DNA. The defendant argued that the DNA expert's testimony violated his Sixth Amendment confrontation right pursuant to *Crawford* because the expert's opinion was based on testing that the expert did not personally conduct. Id. at 593-594, 61 Cal.Rptr.3d 580, 161 P.3d 104.

**{¶ 62}** The defendant in *Geier* further argued that under *Crawford*, the DNA report that was the basis of the expert's testimony was testimonial "because it was a statement 'made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *Geier*, 41 Cal.4th at 598, 61 Cal.Rptr.3d 580, 161 P.3d 104, quoting *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177. The *Geier* court stated the issue as "whether the admission of scientific evidence, like laboratory reports, constitutes a testimonial statement that is inadmissible unless the person who prepared the report testifies or *Crawford*'s conditions—unavailability and a prior opportunity for cross-examination—are met," and then observed that courts disagree as to the answer. Id.

**{¶ 63}** The court noted that some courts adopt a bright-line test concluding that because scientific-test evidence (whether it be fingerprint analysis, autopsy reports, serology reports, drug-analysis reports, or DNA reports) is prepared for possible use in a criminal trial, it is "testimonial" under *Crawford*. As typical examples of this position, the court cited *State v. Caulfield* (Minn.2006), 722 N.W.2d 304, and *Las Vegas v. Walsh* (2005), 121 Nev. 899, 124 P.3d 203; and also the decision of the court of appeals below in this case: *State v. Crager*, 164 Ohio App.3d 816, 2005-Ohio-6868, 844 N.E.2d 390. *Geier*, 41 Cal.4th at 599, 61 Cal.Rptr.3d 580, 161 P.3d 104.

**{¶ 64}** The *Geier* court then noted that other courts have held that scientific evidence is not testimonial, even if it was prepared for possible use at trial. Some courts base this conclusion on indications within *Crawford* that such evidence does not implicate the abuses the Confrontation Clause is meant to prevent, and other courts rely on *Crawford*'s comments that "business records" generally are not within the scope of Confrontation Clause concerns. Id.

**{¶ 65}** The *Geier* court concluded that "[t]hese more nuanced readings of *Crawford* reject those readings that 'focus too narrowly on the question of

whether a document may be used in litigation. This was but one of the several considerations that *Crawford* identified as bearing on whether evidence is testimonial [and] [n]one of these factors was deemed dispositive.' (*People v. So Young Kim* (2006), 368 Ill.App.3d 717 [720], 307 Ill.Dec. 92, 859 N.E.2d 92, 94 [certification of Breathalyzer machine used to determine blood-alcohol content not testimonial].)" *Geier*, 41 Cal.4th at 600, 61 Cal.Rptr.3d 580, 161 P.3d 104. See also *People v. Johnson* (2004), 121 Cal.App.4th 1409, 1412, 18 Cal.Rptr.3d 230 ("A laboratory report does not 'bear testimony,' or function as the equivalent of in-court testimony. If the preparer had appeared to testify * * * he or she would merely have authenticated the document"); *Commonwealth v. Verde* (2005), 444 Mass. 279, 283-284, 827 N.E.2d 701 (certificates of chemical analysis "merely state the results of a well-recognized scientific test determining the composition and quantity of the substance" and have "very little kinship to the type of hearsay the confrontation clause was intended to exclude * * * . [I]t is akin to a business or official record, which the [*Crawford*] Court stated was not testimonial in nature").

{¶ 66} After reviewing the various cases from around the country (including our decision in *State v. Craig*), the California Supreme Court in *Geier* concluded, "While we have found no single analysis of the applicability of *Crawford* and *Davis* to the kind of scientific evidence at issue in this case to be entirely persuasive, we are nonetheless more persuaded by those cases concluding that such evidence is not testimonial, based on our own interpretation of *Crawford* and *Davis*." *Geier*, 41 Cal.4th at 605, 61 Cal.Rptr.3d 580, 161 P.3d 104. The *Geier* court determined that the key factor for determining that a scientific-test report is "testimonial" is whether it "describes a past fact related to criminal activity" even when the report was made at the request of law-enforcement officers and was prepared for possible use at trial. Id.

**{¶ 67}** In answering this key question in the negative, the *Geier* court stated that the report of the DNA analyst who did the actual testing "constitute[s] a contemporaneous recordation of observable events rather than the documentation of past events. That is, [the analyst] recorded her observations regarding the receipt of the DNA samples, her preparation of the samples for analysis, and the results of that analysis as she was actually performing those tasks. 'Therefore, when [she] made these observations, [she]—like the declarant reporting an emergency in *Davis*—[was] "not acting as [a] witness[ ];" and [was] "not testifying." ' " Id., 41 Cal.4th at 605-606, 61 Cal.Rptr.3d 580, 161 P.3d 104, quoting *United States v. Ellis* (C.A.7, 2006), 460 F.3d 920, 926-927.

**{¶ 68}** We agree with this analysis in *Geier*, which specifically rejects the approach of those courts that hold that laboratory reports are testimonial "because their primary purpose was to establish a fact at trial regarding the defendant's guilt," id., including *State v. March* (Mo.2007), 216 S.W.3d 663. *March* and decisions like it improperly read *Davis* to find any statement "testimonial" whenever it might reasonably be expected to be used at trial, when the inquiry actually should focus on "whether the statement represents the contemporaneous recordation of observable events." *Geier*, 41 Cal.4th at 606 and 607, 61 Cal.Rptr.3d 580, 161 P.3d 104.

**{¶ 69}** In ultimately determining that the DNA report at issue in that case was nontestimonial, the *Geier* court observed that the report and notes of the DNA analyst who did the testing "were generated as part of a standardized scientific protocol that she conducted pursuant to her employment at [the lab]. While the prosecutor undoubtedly hired [the lab] in the hope of obtaining evidence against defendant, [the testing analyst] conducted her analysis, and made her notes and report, as part of her job, not in order to incriminate defendant. Moreover, to the extent [the testing analyst's] notes, forms and report merely recount the procedures she used to analyze the DNA samples, they are not

themselves accusatory, as DNA analysis can lead to either incriminatory or exculpatory results. Finally, the accusatory opinions in this case * * * were reached and conveyed not through the nontestifying technician's laboratory notes and report, but by the testifying witness.

{¶ 70} "* * * In simply following [the lab's] protocol of noting carefully each step of the DNA analysis, recording what she did with each sample received, [the testing analyst] did not 'bear witness' against defendant. (*State v. Forte*, supra, [360 N.C. at 435] 629 S.E.2d at p. 143.) Records of laboratory protocols followed and the resulting raw data acquired are not accusatory. 'Instead, they are neutral, having the power to exonerate as well as convict.' *(Ibid.)*" *Geier*, 41 Cal.4th at 607, 61 Cal.Rptr.3d 580, 161 P.3d 104.

III

{¶ 71} Based on the *Geier* court's broad generalized conclusion that DNA and other scientific-testing reports are manifestly not testimonial, any factual distinctions between the situation in that case and the situation in the case sub judice are irrelevant for our purposes. Thus, it makes no difference that the DNA testing in *Geier* was done by a private laboratory in contrast to the fact that BCI did the testing in the present case. Furthermore, it makes no difference that the analyst who testified in *Geier* personally signed the DNA report, in contrast to the facts here that Wiechman did not sign either DNA report and specifically participated only in the "second round" of DNA testing that produced State's Exhibit 57. Due to the nature of the *Geier* court's fundamental reasoning, its conclusion that DNA reports are nontestimonial is fully applicable to the circumstances of this case as persuasive authority.

{¶ 72} The reasoning of *Geier* is also fully consistent with our reasoning and result in *Craig*. See 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621. The DNA reports at issue in this case are no different from the autopsy report at issue in *Craig* for Confrontation Clause purposes. Under Evid.R. 803(6), the

reports are business records of scientific tests that are nontestimonial under *Crawford* and *Davis*. The reports fall well outside the "core class" of statements identified in *Crawford* that may implicate the Confrontation Clause. Furthermore, in this case, Wiechman was a qualified expert who was subject to cross-examination, as was the testifying doctor in *Craig*. When DNA reports are properly determined to be nontestimonial, it necessarily follows that Crager's Sixth Amendment Confrontation Clause rights were not violated.

{¶ 73} Although we acknowledge that the record shows that Wiechman played no role in developing the DNA analysis that resulted in State's Exhibit 56 in this case, that concern is irrelevant. As in *Geier* and in *Craig*, the testifying witness, Wiechman, conveyed the "testimonial" aspects of the DNA results against Crager, and Wiechman was subject to cross-examination. Just as in *Craig*, the defense had the opportunity to question Wiechman "about the procedures that were performed, the test results, and [his] expert opinion about" the conclusions to be drawn from the DNA reports. Id., 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, at ¶ 79. Wiechman had fully reviewed the complete file, not just the DNA reports admitted into evidence and not just the report he participated in preparing, and had reached his own conclusions about both reports "to a reasonable degree of scientific certainty." It is thus of no import that he did not actively participate in both rounds of DNA testing.

{¶ 74} An examination of defense counsel's cross-examination of Wiechman reveals that this case does not implicate the types of abuses that concerned the *Crawford* court. Crager did not challenge the specific testing protocol or the accuracy of the raw data. There is no indication in the questions or in Wiechman's responses that there were any flaws in the testing itself. Rather, defense counsel principally questioned Wiechman about general matters known to any DNA expert, such as the limits of what DNA testing can establish. When defense counsel did question the specifics of the DNA test results in this case,

Wiechman was fully qualified to, and did, answer any questions defense counsel asked.

{¶ 75} Furthermore, for the most part, Wiechman responded with answers that helped the defense make its points, such as that DNA testing cannot establish how a particular stain came to be on a particular item or when a person's DNA might have appeared on an item. In addition, defense counsel was able to establish through Wiechman's testimony that some items that could have been tested were not. As with the autopsy in *Craig*, Wiechman readily asserted that he himself had not done the actual DNA testing, so the jury was well aware of that fact.

{¶ 76} It is apparent that Crager's right to confrontation was not at all affected by Wiechman's testifying. Moreover, if Duvall, who actually did the DNA testing, had testified instead of Wiechman, her responses to defense counsel's questions likely would have been very similar, if not identical, to Wiechman's. There are no indications that Crager was not able to conduct a meaningful cross-examination concerning State's Exhibit 56.

{¶ 77} As a final matter, the practical results of affirming the judgment of the court of appeals in this case would be problematical. If all the DNA analysts who had actively participated in the testing and review process that generated the DNA reports were unavailable to testify (for example, if all had died), should that mean that no expert DNA witness, after reviewing the relevant materials, would have been qualified to testify? If that were the situation, would the DNA tests have to be redone, even though there are no questions about the accuracy of the tests, and there are no indications of any discrepancies? These potential consequences seem especially incongruous when viewed in light of the considerations discussed above, i.e., that records of laboratory protocols that were followed and of the resulting raw data are not accusatory and therefore are not "testimonial."

**{¶ 78}** For all the foregoing reasons, we hold that records of scientific tests are not "testimonial" under *Crawford*. This conclusion applies to include those situations in which the tests are conducted by a government agency at the request of the state for the specific purpose of potentially being used as evidence in the criminal prosecution of a particular person.

**{¶ 79}** We further hold that a criminal defendant's constitutional right to confrontation is not violated when a qualified expert DNA analyst testifies at trial in place of the DNA analyst who actually conducted the testing. In that situation, the testifying expert analyst is the witness who is subject to cross-examination and is the one who presents the true "testimonial" statements.

**{¶ 80}** Accordingly, we reverse the judgment of the court of appeals. We remand the cause to that court to address the unresolved assignments of error that it found moot and therefore did not address.

Judgment reversed

and cause remanded.

LUNDBERG STRATTON, O'DONNELL, and LANZINGER, JJ., concur.

KLINE, J., concurs separately.

MOYER, C.J., and PFEIFER, J., dissent.

ROGER L. KLINE, J., of the Fourth Appellate District, sitting for CUPP, J.

_____

**KLINE, J., concurring**.

**{¶ 81}** I concur in the majority opinion and find that the DNA reports at issue in this case are business records that are not "testimonial" under *Crawford v. Washington* (2004)*,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. I write separately to explain why I respectfully disagree with the lower court's holding that "the fact that these [DNA] reports are prepared *solely* for prosecution makes them testimonial." (Emphasis added.) *State v. Crager,* 164 Ohio App.3d 816, 2005-Ohio-6868, 844 N.E.2d 390, ¶37. In my view, absent evidence to the

contrary, it should be presumed that the primary purpose behind any county prosecutor's request for DNA analysis is to seek justice, not merely to prosecute or convict a defendant.

{¶ 82} In Ohio, the county prosecutor is required to follow a code of ethics. As in effect at the relevant time, Canon 7 of the Code of Professional Responsibility, EC 7-13 provides:

{¶ 83} "The responsibility of a public prosecutor differs from that of the usual advocate; *his duty is to seek justice, not merely to convict.* This special duty exists because: (1) the prosecutor represents the sovereign and therefore should use restraint in the discretionary exercise of governmental powers, such as in the selection of cases to prosecute; (2) during trial the prosecutor is not only an advocate but he also may make decisions normally made by an individual client, and those affecting the public interest should be fair to all; and (3) in our system of criminal justice the accused is to be given the benefit of all reasonable doubts." (Emphasis added.)

{¶ 84} Here, the prosecutor asked BCI for the DNA analysis through glasses of justice, not glasses of conviction. Prosecutors' decisions are to "be fair to all." Id. This includes Crager. When the prosecutor asked for the analysis, he certainly did not know the results. At the precise time he asked, the future DNA results could (1) exonerate Crager and eliminate the need for a trial or prosecution or (2) implicate Crager and require a trial or prosecution. The record demonstrates that the prosecutor's conduct in this area comports with this high standard of professional responsibility.

{¶ 85} DNA expert Steven M. Wiechman testified to the guidelines BCI follows when conducting its tests. He said, "[U]ltimately it's the Prosecutor's decision on what we'll actually look at." However, he stated that the prosecutor does not dictate the results and that BCI is "an unbiased agency."

{¶ 86} Therefore, in my view, when BCI followed its "unbiased" guidelines and prepared the business records at the request and general direction of the county prosecutor, it did so with the primary purpose of seeking justice. Justice may, or may not, require prosecution.

{¶ 87} Accordingly, in the context of this explanation, I concur in the majority opinion.

_____

**PFEIFER, J., dissenting**.

{¶ 88} Because the majority opinion is contrary to the Supreme Court's holding in *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, conflicts with syllabus law from this court's recent decision in *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, and limits a defendant's ability to cross-examine the person who has produced a DNA report that essentially identifies him as the perpetrator, I dissent.

{¶ 89} DNA evidence has become the "smoking gun" in criminal trials. It can be a powerful tool for conviction or exoneration. DNA evidence is too central to prosecution to allow the routine introduction of such evidence as a business record. To do so would permit a records clerk to present the most important piece of evidence against a defendant without allowing that defendant to cross-examine the person responsible for preparing the report.

{¶ 90} The most important piece of evidence in this case is State's Exhibit 56, the DNA report that identifies Esta Boyd's blood on defendant Crager's shirt. Steve Wiechman testified regarding the contents of that report and to its ultimate conclusion. Through Wiechman's testimony, State's Exhibit 56 was entered into evidence. But one inescapable fact finally emerges well into the majority opinion: Wiechman played no role in producing State's Exhibit 56. The majority opinion cites Wiechman's testimony that he "technically reviewed" the work of the DNA analyst, Jennifer Duvall, who did the actual testing on the blood samples

in State's Exhibit 56. The majority opinion describes that technical review, and states that "Wiechman stated that when he did the technical review, he did not know when the case would be tried or that he would be testifying." Majority opinion at ¶ 19. The only problem is that Wiechman did not, in fact, technically review State's Exhibit 56. That fact emerges farther into the majority opinion, though it is treated as unremarkable by the majority: "On cross-examination, Wiechman stated that he 'actually technically reviewed the second [round of testing], but in preparation for court I reviewed, unofficially to prepare for testimony, I reviewed the entire case file.' " Majority opinion at ¶ 24. So, despite the majority's citing Wiechman's testimony that when he did his technical review, "he did not know when the case would be tried or that he would be testifying," the truth is that Wiechman did not conduct the technical review of State's Exhibit 56, but instead "reviewed" Duvall's file regarding State's Exhibit 56 for the sole purpose of preparing to testify.

{¶ 91} Though he had nothing to do with preparing the DNA report that became State's Exhibit 56, Wiechman testified about its contents. His testimony regarding State's Exhibit 56 was largely a recitation of Duvall's report:

{¶ 92} "Q: And showing you what's been marked as State's Exhibit 56, can you identify that for us?

{¶ 93} "A: Yes. This appears to be a copy of Jennifer Duvall's report regarding this case.

{¶ 94} "Q: And does that contain the findings and conclusions that you have testified to thus far?

{¶ 95} "A: Yes, it does.

{¶ 96} "Q: And are those findings and conclusions determinations you would hold to a reasonable degree of scientific certainty?

{¶ 97} "A: Yes."

**{¶ 98}** With this factual background established, the import of the majority's holding becomes clearer. The majority holds that a DNA report can be admitted into evidence without the person who produced it having to testify about it. Under the majority's ruling, a defendant's rights under the Confrontation Clause are not affected when one DNA expert testifies as to the contents of another DNA expert's DNA report, even when the nontestifying DNA expert's report is admitted into evidence based upon the testifying witness's testimony.

**{¶ 99}** In *Crawford v. Washington*, 541 U.S. at 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177, the Supreme Court of the United States stated that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."

**{¶ 100}** The court in *Crawford* left "for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177. That day has yet to arrive, but the court in *Crawford* noted "various formulations" of the "core class" of testimonial statements, without adopting one as definitive: (1) ex parte in-court testimony or its equivalent, such as affidavits, custodial interrogations, prior testimony for which the defendant had no opportunity to cross-examine, or other pretrial statements that declarants would reasonably expect to be used in a prosecution, (2) extrajudicial statements in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, or (3) statements made under circumstances that would lead an objective witness to a reasonable belief that the statement could be used at a later trial. *Crawford*, 541 U.S. at 51-52, 124 S.Ct. 1354, 158 L.Ed.2d 177.

**{¶ 101}** In *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, this court adopted as definitive the third of the formulations discussed by the *Crawford* court:

{¶ 102} "For Confrontation Clause purposes, a testimonial statement includes one made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " Id. at paragraph one of the syllabus, quoting *Crawford* at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 103} The majority tries to ignore *Stahl* and its first syllabus paragraph, adopting curious reasoning. The majority writes that "*Stahl* has no application here because *Stahl* involved the testimonial nature of actual oral 'statements' of a declarant and did not involve records of scientific tests or the business-records exception to the hearsay rule." Majority opinion at ¶ 95. The majority acts as if non-oral statements are not "actual." Are nonoral statements pretend? The *Stahl* syllabus is not self-limiting to "actual oral statements" – it applies to "statements." Evid.R. 801(A) defines a "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." The written assertions in State's Exhibit 56 are most certainly statements, and *Stahl* most certainly applies to those statements. *Stahl* cannot be ignored in this case.

{¶ 104} The majority instead attempts to rely on *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, a case that predates *Stahl*. In *Craig*, this court considered the admissibility of an autopsy report prepared by a doctor who was no longer affiliated with the medical-examiner's office. In *Craig*, Dr. Lisa Kohler, the Summit County medical examiner at the time of the trial, testified about a murder victim's autopsy even though another doctor, who had retired prior to the trial, had actually performed the autopsy. Dr. Kohler testified that she had reviewed all the materials prepared in connection with the autopsy, but the defense objected to her testimony, arguing that she lacked firsthand knowledge of the autopsy. Id. at ¶ 73. Dr. Kohler provided her own expert

testimony on the cause and time of death, and the trial court admitted the autopsy report into evidence.

{¶ 105} This court held in *Craig* that Kohler's testimony and the admission of the autopsy report into evidence did not violate the defendant's rights under the Confrontation Clause. The court adopted "the majority view under *Crawford* * * * that autopsy records are admissible as nontestimonial business records," and held that "Dr. Kohler's expert testimony about the autopsy findings, the test results, and her opinion about the cause of death did not violate Craig's confrontation rights." *Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 88.

{¶ 106} We called the autopsy report in *Craig* "the 'quintessential business record' " and found that " 'such records or statements are not testimonial in nature because they are prepared in the ordinary course of regularly conducted business and are "by their nature" not prepared for litigation.' " Id. at ¶ 82, quoting *People v. Durio* (2005), 7 Misc.3d 729, 734, 794 N.Y.S.2d 863. Although this court used the term "business records," our determination that the autopsy report was *nontestimonial* was the key holding in *Craig*.

{¶ 107} The Confrontation Clause "applies to 'witnesses' *against the accused*." (Emphasis added.) *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354, 158 L.Ed.2d 177. A coroner is concerned with how the decedent died rather than who may have killed him. Thus, the coroner is not a "witness" against a specific person when he or she prepares a report from an autopsy. A coroner's report is not done at the behest of the prosecution in preparation for litigation; it is done pursuant to statute. See R.C. 313.131(B).

{¶ 108} That is in contrast with the DNA reports in this case. BCI is an arm of law enforcement, a statutorily created bureau within the office of the attorney general. R.C. 109.51. BCI is called upon by the General Assembly to "aid law enforcement officers in solving crimes and controlling criminal activity."

R.C. 109.52. The lab work in this case was performed at the behest of the prosecutor. Lab personnel interacted with the prosecutor's office regarding how to proceed with the case. In performing the tests, lab personnel were attempting to prove the involvement of Crager. Among the items tested were Crager's articles of clothing. The lab personnel objectively had to believe that their findings would be used at trial against a known defendant. That they were performing their normal business activities in producing the reports does not make their reports nontestimonial. The reports were prepared in anticipation of litigation and are thus testimonial under *Stahl*.

{¶ 109} Whether evidence fits or does not fit into a hearsay exception such as the business-records exception is not relevant for Confrontation Clause purposes. The key question is whether the evidence is testimonial, that is, whether an objective witness would reasonably believe that a statement would be used at trial. A business record from a telephone company does not require an opportunity for cross-examination, because those records are not generated in order to be used in criminal prosecutions. They do not implicate the Confrontation Clause not because of the label "business records" but because of their character. To label something a business record when it catalogues the activity of an entity like BCI, whose business is analyzing evidence in pursuit of convictions, does not remove that record from the purview of the Confrontation Clause. "When a laboratory report is created for the purpose of prosecuting a criminal defendant, * * * it is testimonial." *State v. March* (Mo.2007), 216 S.W.3d 663, 667. In *March*, the court found that the Confrontation Clause was violated when the analyst who identified a substance as cocaine in a drug case did not testify regarding his report. The prosecution instead called a records custodian to testify about the report. The court in *State v. Caulfield* (Minn.2006), 722 N.W.2d 304, similarly held that a drug report prepared by a bureau of criminal investigations was testimonial. In *Las Vegas v. Walsh* (2005), 121 Nev.

899, 124 P.3d 203, the court held that an affidavit prepared for use at trial is testimonial. That case involved an affidavit from a nurse who drew blood from a defendant for a blood-alcohol test.

{¶ 110} Finding that DNA reports are testimonial in this case would not create an unnecessary practical hardship for the state in future cases. Although the reports admitted into evidence in this case contained the signature of Duvall alone, the practical reality of a DNA analysis is that it represents the work of more than one person. As Wiechman testified, the protocol in place at BCI required input from two analysts and a supervisor on every DNA report. One analyst performs the tests, a second reviews the results, and a supervisor reviews them again. Since more than one person is responsible for the production of a DNA report, more than one person can testify as to the contents of a report.

{¶ 111} In *State v. Williams* (2002), 253 Wis.2d 99, 644 N.W.2d 919, the Wisconsin Supreme Court considered the trial court's admission of testimony regarding lab-test results indicating that a substance the defendant possessed was cocaine. The analyst who conducted the tests determining that the substance was cocaine did not testify, but a unit leader in the drug-identification section of the crime lab who had performed the peer review of those tests did testify. The court held that "the presence and availability for cross-examination of a highly qualified witness, who is familiar with the procedures at hand, supervises or reviews the work of the testing analyst, and renders her own expert opinion is sufficient to protect a defendant's right to confrontation, despite the fact that the expert was not the person who performed the mechanics of the original tests." *Williams* at 114, 644 N.W.2d 919.

{¶ 112} To satisfy the defendant's confrontation rights, the testifying witness must be actively involved in the preparation of the report he is testifying about:

{¶ 113} "The right to confrontation is not satisfied when the government produces a witness who does nothing but summarize out-of-court statements and opinions made by others. [*United States v. Lawson* (C.A.7, 1981), 653 F.2d 299, 302]."

{¶ 114} "The critical point illustrated by *Lawson* is the distinction between an expert who forms an opinion based in part on the work of others and an expert who merely summarizes the work of others. In short, one expert cannot act as a mere conduit for the opinion of another." *Williams*, 253 Wis.2d at 113, 644 N.W.2d 919.

{¶ 115} Here, Wiechman played no role in the development of the DNA analysis introduced as State's Exhibit 56. He was not the lead analyst, he did not perform the technical review, and he did not perform a supervisory role. Had he filled any of those roles for State's Exhibit 56, he could have testified and not affected Crager's rights under the Confrontation Clause.

{¶ 116} The majority states that had Duvall testified instead of Wiechman, her testimony would have been "very similar, if not identical, to Wiechman's." Certainly, Wiechman was very familiar with reports like State's Exhibit 56, which are routinely produced by respected laboratories every day. But courts must take care not to assume reliability, and thus admissibility, based upon the source of the report: "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." *Crawford*, 541 U.S. at 62, 124 S.Ct. 1354, 158 L.Ed.2d 177. A focus on presumed reliability of reports is a remnant of *Roberts*. As the court said in *Crawford*:

{¶ 117} "To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular

manner: by testing in the crucible of cross-examination." Id. at 61, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 118} The lab report conclusively identified Boyd's blood on Crager's shirt. That report was admitted into evidence. That report was not Wiechman's work, and the report does not become admissible simply because Wiechman read from it: "[W]e do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman *recite* the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition." (Emphasis sic.) *Davis v. Washington* (2006), 547 U.S. 813, ___, 126 S.Ct. 2266, 2276, 165 L.Ed.2d 224.

{¶ 119} The majority makes much of the California Supreme Court's holding in *People v. Geier* (2007), 41 Cal.4th 555, 61 Cal.Rptr.3d 580, 161 P.3d 104. *Geier* differs from this case in important aspects. First, the California Supreme Court is not duty-bound to follow this court's precedent, specifically this court's recent syllabus holding in *Stahl* that "[f]or Confrontation Clause purposes, a testimonial statement includes one made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at paragraph one of the syllabus, quoting *Crawford,* 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 120} Second, *Geier* is the result of an entirely different factual scenario. In *Geier*, Dr. Cotton, the testifying witness, was a laboratory director for Cellmark, "a private, for-profit company that performs DNA testing in paternity and criminal cases." Id. at 594, 61 Cal.Rptr.3d 580, 161 P.3d 104. Cotton did not conduct the DNA analysis herself, but was the supervisor of the person who analyzed the DNA samples, and Cotton cosigned the DNA report as well as two follow-up letters to the law-enforcement agency involved in the case. Id. at 596, 61 Cal.Rptr.3d 580, 161 P.3d 104. Further, the *Geier* court relied on

the fact that the match found between the defendant's DNA and DNA taken from the victim – that is, the core accusation against the defendant — was the work of Cotton, not the analyst:

**{¶ 121}** "[T]o the extent [that the analyst's] notes, forms and report merely recount the procedures she used to analyze the DNA samples, they are not themselves accusatory, as DNA analysis can lead to either incriminatory or exculpatory results. * * * [T]he accusatory opinions in this case – that defendant's DNA matched that taken from the victim's vagina and that such a result was very unlikely unless defendant was the donor – were reached and conveyed not through the nontestifying technician's laboratory notes and report, but by the testifying witness, Dr. Cotton." Id. at 607, 61 Cal.Rptr.3d 580, 161 P.3d 104.

**{¶ 122}** In contrast, the trial court here admitted the DNA report prepared by the nontestifying witness, Duvall, and that report contained the damning accusatory opinion that Boyd's blood was on Crager's shirt. This case is thus entirely factually distinguishable from *Geier*.

**{¶ 123}** This case also differs from another case cited by the majority, *State v. Forte* (2006), 360 N.C. 427, 629 S.E.2d 137, which presents a "cold case" scenario not present in this case. In *Forte*, DNA from victims of an unknown assailant was collected and analyzed in 1990 by a State Bureau of Investigation agent, D.J. Spittle. In 2001, the defendant's DNA, recorded in a database during the 1990s, was matched with the DNA Spittle had analyzed in 1990. Spittle was unavailable to testify at the defendant's trial, but his supervisor introduced Spittle's reports into evidence. The *Forte* court found that the reports, containing the results of Spittle's objective analysis of the evidence, along with routine chain of custody information, "[did] not bear witness against [the] defendant." *Forte*, 360 N.C. at 435, 629 S.E.2d 137. The court found that "[a]lthough * * * the reports were prepared with the understanding that eventual use in court was possible or even probable, they were not prepared exclusively for trial and Agent

Spittle had no interest in the outcome of any trial in which the records might be used." Id. Here, unlike in *Forte*, the DNA report was created for the purpose of prosecuting a known defendant.

{¶ 124} Since Wiechman was involved in no way in the preparation of State's Exhibit 56, and since neither the actual preparer, nor the technical reviewer, nor the supervisor testified, Crager was not able to conduct a meaningful cross-examination of a person responsible for the preparation of the report that was ultimately admitted into evidence. Thus, Crager's rights under the Confrontation Clause were violated.

MOYER, C.J., concurs in the foregoing opinion.

_____

Jim Slagle, Marion County Prosecuting Attorney, for appellant.

Collins & Lowther, L.P.A., and Kevin P. Collins, for appellee.

Marc Dann, Attorney General, Elise Porter, Acting State Solicitor, and Stephen P. Carney, Deputy Solicitor, urging reversal for amicus curiae Attorney General of Ohio.

William F. Schenck and Elizabeth A. Ellis, urging reversal for amicus curiae Ohio Prosecuting Attorneys Association.

Eric J. Allen, urging affirmance for amicus curiae Ohio Association of Criminal Defense Lawyers.

_____